**DIESEL MACHINERY, INC., Plaintiff,**

v.

**B.R. LEE INDUSTRIES, INC., Defendant.**

**No. CIV. 01–4178.**

United States District Court, D. South Dakota, Southern Division.

Sept. 30, 2003.

---

Rollyn H. Samp, Samp Law Office, Sioux Falls, SD, Michael P. Healy, Steven L. Hobson, Healy Law Firm, Kansas City, MO, for Plaintiff.

Carleton R. Hoy, James L. Hoy, Hoy & Hoy, Sioux Falls, SD, William A. Clineburg, Jr., Alex S. Drummond, King & Spalding, Atlanta, GA, for Defendant.

**1.** The trial transcript will be referred to as "TT" followed by the appropriate page number.

## MEMORANDUM OPINION AND ORDER

PIERSOL, Chief Judge.

After the Plaintiff, Diesel Machinery, Inc. ("DMI"), obtained a judgment against Defendant, B.R. Lee Industries, Inc. ("LeeBoy"), for lost business profits in the amount of $665,000 and for punitive damages in the sum of $4,335,000, LeeBoy filed a motion for judgment notwithstanding the verdict or, alternatively, for new trial or remittitur. (Doc. 279.)

### BACKGROUND

On October 2, 2000, DMI and LeeBoy entered into a Dealership Agreement giving DMI the exclusive right to sell LeeBoy products in South Dakota and certain counties in Minnesota. On July 12, 2001, LeeBoy Sales Manager Bryce Davis called DMI President Dan Healy and told Mr. Healy that DMI's agreement was cancelled effective immediately. Two or three days prior to the phone call to DMI, LeeBoy had contacted another dealer in Sioux Falls, J.D. Evans, and asked that company to be LeeBoy's exclusive dealer in South Dakota. *See* Trial Transcript at p. 533.[1] Mr. Davis did not give any reason for the termination during the July 12 telephone call to Dan Healy. LeeBoy sent a confirmation letter to Mr. Healy dated July 12, 2001, indicating that it had acquired another product line (Rosco) for which there was already an existing dealer in Sioux Falls and that "[t]he consolidation of dealers has resulted in the cancellation of your LeeBoy Dealer Agreement effective July 12, 2001." On July 20, 2001, DMI's lawyer sent a letter to LeeBoy threatening litigation. (Doc. 112, Defendant's Motion for Summary Judgment, Ex. C, marked as Ex.

20 for trial but not offered or received; TT at 127.) Among other things, the July 20 letter set forth the terms of South Dakota's Dealer Protection Act, SDCL § 37–5–3, explained that DMI sued Ingersoll–Rand for wrongful termination of DMI's Ingersoll–Rand franchise agreement, and offered to settle with LeeBoy for $600,000. (Doc. 112.) Attached to the letter was a copy of this Court's Memorandum Opinion and Order issued in the *Ingersoll–Rand* case. (*Id.*) The letter requested a response from LeeBoy by August 3, 2001. Kelly Majeski, Vice President of Sales and Marketing for LeeBoy, testified that he called to talk to Dan Healy after he received the July 20 letter, but Dan Healy simply referred Mr. Majeski to his lawyer. (TT at 774.) Dan Healy does not remember that phone call. (TT at 554.)

This lawsuit was filed on August 9, 2001. After the lawsuit was filed, LeeBoy sent letters to counsel for DMI indicating that LeeBoy was denying liability under the South Dakota statutes and that LeeBoy thought DMI's claims were "spurious and essentially worthless." (TT at 127.) On September 13, 2001, LeeBoy's lawyer sent a letter to DMI's lawyer which stated, in part:

> Although DMI's productivity fell far short of LeeBoy's expectation, DMI has contended since the termination of the Agreement that it values its relationship with LeeBoy. Due to this expression of interest, LeeBoy is prepared to re-appoint DMI as its exclusive dealer pursuant to a mutually acceptable dealer Agreement that complies with South Dakota law.
>
> Please let me know by the close of business on September 18, 2001 if this is acceptable and we will forward a copy of a proposed Agreement.

(Plaintiff's Exhibit 83.) That is the first time Pat Healy, DMI's owner, had ever heard that LeeBoy thought DMI's sales performance fell short of LeeBoy's expectations. (TT at 128–131.)

DMI filed a motion for summary judgment contending that the Court should find as a matter of law that LeeBoy's cancellation of the dealer franchise was done unfairly, without due regard to the equities of the dealer and without just provocation, all in violation of SDCL § 37–5–3. LeeBoy asserted that DMI's limited sales and failure to maintain an inventory of LeeBoy's products justified the termination of the franchise. LeeBoy argued that only a jury could decide whether LeeBoy had cause to terminate its relationship with DMI based on the latter's alleged poor performance. The Court disagreed with LeeBoy's argument because the record is clear that LeeBoy did not rely on DMI's lack of performance as a reason for terminating the franchise. DMI's Statement of Undisputed Material Facts states at paragraph 202:

> At the time LeeBoy announced DMI was terminated, LeeBoy did not suggest nor did it think that DMI had breached or violated any portion of the Dealership Agreement including any of the conditions of § 8.3. *Labriola Depo.* at 32–34, attached as Ex.2.

(Doc. 107, p. 46.) (Section 8.3 of the Agreement sets out nine grounds for default that would allow LeeBoy to terminate the Agreement by providing written notice of the termination.) LeeBoy responded: "LeeBoy admits Paragraph 202, but denies its relevance to Plaintiff's Motion." (Doc. 135, p. 21.) Second, during the pretrial conference on October 7, counsel for LeeBoy admitted that LeeBoy terminated the franchise with DMI for the sole reason that LeeBoy had acquired Rosco and it made no sense to have two dealers in a small market like South Dakota. Third, in support of its motion for summary judgment, DMI submitted an Affidavit signed

by Dan Healy on behalf of DMI which states, in part:

> LeeBoy never advised, suggested or told DMI that it had any problem, concern, complaint, disagreement or criticism of DMI in any way or that DMI had breached any part of the Dealer Agreement, or violated any LeeBoy policy, program or procedure or that DMI had any kind of shortcoming or insufficiency relating to advertising, signage, marketing, sales, service or part performance or any other matter, or that DMI should do or refrain from doing anything that DMI was or was not doing.

(Doc. 107, Ex. 1.) LeeBoy did not submit any evidence contradicting DMI's affidavit.[2]

During the pretrial conference on October 7, 2002, the Court announced its ruling that the relationship between DMI and LeeBoy was a franchise. By Memorandum Opinion and Order issued on October 24, 2002, the Court granted DMI's motion for summary judgment, finding that it had been conclusively established that "LeeBoy unfairly terminated the agreement with DMI without due regard to the equities of DMI and without just provocation, all in violation of SDCL § 37–5–3." (Doc. 204, p. 7.) The amount of damages remained the only issue for trial.

Both parties filed numerous motions in limine prior to trial. The Court will limit its discussion to the rulings that LeeBoy argues entitles it to judgment notwithstanding the jury's verdict or, in the alternative, a new trial or remittitur.

DMI moved to exclude any reference to its litigation with Ingersoll–Rand. (Doc. 202.) LeeBoy wanted to introduce evidence of the Ingersoll–Rand litigation in order to argue that DMI did not pursue reinstatement of the LeeBoy dealership agreement because DMI officers thought they could make more money litigating than selling LeeBoy equipment as they allegedly had done before with Ingersoll–Rand. This Court decided to exclude the evidence after making a specific finding that the probative value of DMI's lawsuit against Ingersoll–Rand, and settlement of the lawsuit, was outweighed by the confusion it would cause the jury. (TT at 8). See Fed.R.Evid. 403. However, a witness for DMI testified during DMI's case-in-chief that it did not sell more Ingersoll–Rand pavers because the pavers were low quality and DMI had bad experiences with them. The Court found that DMI had opened the door to testimony regarding the fact that Ingersoll–Rand had terminated its dealership agreement with DMI. LeeBoy then elicited testimony from a number of witnesses that DMI had been terminated by Ingersoll–Rand (TT at 246; 399; 637; 756; 1014). LeeBoy also elicited testimony that DMI had "been down

---

**2.** The Court notes that in paragraph 100 of LeeBoy's Response to Plaintiff's Statement of Allegedly Undisputed Material Facts, LeeBoy stated, in part, that it informed DMI that it terminated the agreement "based on Plaintiff's poor sales performance." (Doc. 135, p. 12.) In support of this statement, LeeBoy cites to "Def.'s Resp. to First Interrog. No. 8," but LeeBoy does not cite to the record. The Court reviewed LeeBoy's Second Supplemental response to Plaintiff's First Interrogatories attached as. Exhibit 23 to Plaintiff's Exhibits in Support of Its Motion for Partial Summary Judgment (Doc. 107), and that response makes no mention of terminating the agreement. The Court is unable to determine when LeeBoy informed DMI that it terminated the agreement based on DMI's alleged poor sales performance as asserted in paragraph 100 of LeeBoy's Response. But, as stated above, LeeBoy has admitted that it did not think DMI had breached or violated any portion of the dealership agreement at the time that LeeBoy terminated the agreement and LeeBoy admitted that the sole reason it terminated the agreement was the fact that it had acquired Rosco.

that road before," referring to dealership termination disputes. (TT at 178–79; 637.) The Court did not allow LeeBoy to present any more specific testimony regarding DMI's lawsuit against Ingersoll–Rand and the settlement of that lawsuit.

LeeBoy asked the Court to preclude any references during the trial to First Islamic Bank, an investment bank and one of Lee-Boy's owners. (Doc. 195.) In response to that motion, DMI presented evidence that LeeBoy is a "long term investment" of First Islamic Bank. Page 15 of First Islamic's annual report for the year 2000 states it acquired 84% ownership stake in LeeBoy in January, 2000. First Islamic Bank's investment strategies are discussed on page 20 of its annual report:

> First Islamic operates its direct investment line of business through its wholly-owned U.S. subsidiary, Crescent Capital Investments, Inc., which is headquartered in Atlanta, Georgia.

> \* \* \* \* \* \*

> First Islamic's direct investment team works closely with company management to establish a clearly defined business plan, management equity incentives, and a capital structure to foster growth and profitability.

> \* \* \* \* \* \*

> The Bank's aim is to grow its investments through the holding period with strategic and financial support, and to exit at the right time and at the right price in order to maximize returns for all stockholders. To this end, the Bank's direct investment team works together with management to position the company for sale to a financial or strate-

gic buyer, or for an initial public offering.

(Doc. 235, Ex. A.)

Prior to ruling on the motion to preclude references to First Islamic Bank, the Court reviewed the deposition of Ed Underwood. (TT at 36.) Ed Underwood is an Executive Director for First Islamic and Crescent Capital, and he became a director of LeeBoy after the acquisition. (TT at 422, 424, 428.)[3] He received at least quarterly reports from LeeBoy management regarding the progress of dealer terminations. (TT at 435.) DMI's lawyer argued that it was necessary for him to refer to First Islamic Bank during the trial in order to explain to the jury the reason that LeeBoy terminated the dealership agreement with DMI. This Court agreed that it would be proper to refer to First Islamic Bank in regard to the control of LeeBoy, but the Court warned the parties that the name should be used only "in a business-like, fair manner, because obviously with some people in the middle east we have had problems.... so I don't want the plaintiff to take any advantage of any ill feelings there might be, and I will be quick to sustain an objection and give a curative instruction on the spot if you do." (TT at 38.) DMI followed these instructions and LeeBoy did not object to any of the references to First Islamic during the trial.

LeeBoy asked the Court to exclude some of the damages testimony and calculations of Dan Healy, the President of DMI. (Doc. 189.) LeeBoy argued that Dan Healy's estimate of future paver sales and his present value interest rate were outside the scope of permissible lay opinion testimony under Rule 701 of the Federal Rules of Evidence and an attempt to circumvent the requirements for admissi-

---

**3.** Portions of Mr. Underwood's deposition were read to the jury at trial. For ease of reference, the Court will cite to the trial transcript rather than to the deposition.

bility of expert testimony under Rule 702. This Court found that Dan Healy, one of DMI's owners, was qualified to testify about lost future profits and that he had information and experience on which to base his estimate of future paver sales.

During the trial, LeeBoy's expert on the issue of damages, Mr. Burton, testified that the discount rate for reducing future damages to present value was 17.5%. Rather than reducing the lump sum award of future damages by the interest rate or return which DMI could reasonably be expected to receive on an investment of the lump-sum payment, Mr. Burton increased the discount rate to account for risks associated with DMI's cash flow. After hearing Mr. Burton's testimony regarding the 17.5% discount rate, and after overruling DMI's objection to the testimony, the Court reviewed its decision and determined that the testimony should be stricken because South Dakota law requires a risk-free discounted rate. The only testimony of Mr. Burton's that was stricken from the record was the testimony regarding the 17.5% discount rate. The Court explained to the jury that some jurisdictions allow the discount rate proposed by Mr. Burton, but South Dakota is not one of them. TT at 963. Mr. Burton had an opportunity to amend his figures with a different discount rate and to present testimony regarding the amended rate. TT at 965.

On November 12, 2002, after a week of trial, the jury returned a verdict in favor of DMI for lost business profits in the sum of $665,000 and for punitive damages in the sum of $4,335,000.

## DISCUSSION

LeeBoy argues that it is entitled to judgment as a matter of law or a new trial because no reasonable jury could find that DMI acted reasonably when it rejected DMI's reinstatement offer, there was in-

sufficient evidence to support the jury's compensatory and punitive damages awards, and the Court erred in permitting DMI to refer to First Islamic Bank. LeeBoy also argues that the punitive damage award is excessive and should be reduced.

### A. Standard of Review

■ "Under Rule 50, a court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 149, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). When ruling on a motion for judgment as a matter of law, the district court must accord the nonmoving party the benefit of all reasonable inferences, but may not give that party the benefit of unreasonable inferences or resort to speculation. *Fought v. Hayes Wheels Int'l, Inc.*, 101 F.3d 1275, 1277 (8th Cir.1996).

A new trial should be granted if the ends of justice so require. *See Pitts v. Electro–Static Finishing, Inc.*, 607 F.2d 799, 804 (8th Cir.1979). "Courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." 11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 2803 at 46–47 (1995).

### B. Mitigation

In general, "a party cannot recover damages flowing from consequences which that party could reasonably have avoided ... without undue risk, burden, or humiliation. This doctrine is generally applicable to the determination of damages in causes of action involving breach of contract. [The]

law imposes upon a party injured from another's breach of contract or tort the active duty of making reasonable exertion to render the injury as light as possible." *Sun Mortgage Corp. v. Western Warner Oils, Ltd.*, 567 N.W.2d 632, 635 (S.D.1997)(internal punctuation and citations omitted). Further, "the breaching party has the burden of proving damages would have been lessened by the exercise of reasonable diligence on the part of the non-breaching party." *Id.* at 637.

### 1. *Reinstatement Offer and Alternate Manufacturer*

At the trial, DMI presented credible testimony that it did not know exactly what the reinstatement offer from LeeBoy would involve. Testimony also showed that DMI officers did not believe the offer was sincere, in part because, at the same time it made the offer, LeeBoy said, for the first time, that DMI's sales performance fell short of LeeBoy's expectations. DMI officers thought LeeBoy would terminate the relationship again shortly after reinstatement, resulting in loss of customer confidence in DMI. (TT at 127; 130–132; Trial Exhibit 83.) Pat Healy also testified about problems caused by a loss of trust in the relationship between a manufacturer and a dealer. (TT at 95–96.)

Regarding LeeBoy's argument that DMI should have entered into a new relationship with a LeeBoy competitor like Gilchrist in order to mitigate damages, LeeBoy did not introduce any evidence showing that DMI could have secured the Gilchrist product line. In addition, testimony at trial indicated that being the exclusive dealer of LeeBoy products is much more desirable than being a dealer of Gilchrist products. Manley Nutter, an independent contractor for LeeBoy Rosco, testified as follows:

Q. We know that LeeBoy has about 58 percent of the market share, isn't that right?

A. That's the figure we are using, sir.

\* \* \* \* \* \*

Q. Of course, because of this there is no doubt in your mind who you would want to represent if you were representing paver dealers in South Dakota, isn't that right?

A. That's right, sir.

Q. LeeBoy, hands down, right?

A. Yes.

Q. Any other position would be a far lesser position, isn't that true?

A. Yes, sir.

Q. Not just in market share, but also in paver quality, isn't that right?

A. Yes, sir.

TT at 848–849. Moreover, testimony indicated that LeeBoy manufactures force feed loaders and Gilchrist does not, nor does any other manufacturer in North America. TT at 158.

■ There was sufficient evidence for the jury to decide that DMI's refusal to accept reinstatement with LeeBoy was reasonable, and that it was reasonable not to pursue a relationship with Gilchrist.

### 2. *Ingersoll–Rand Case*

LeeBoy again argues that more evidence of the Ingersoll–Rand case should have been admitted to show the "real" reason that DMI failed to mitigate its damages. As stated earlier in this Memorandum Opinion, after DMI opened the door, the Court allowed some testimony regarding the termination of DMI's dealership agreement with Ingersoll–Rand. However, the Court stands by its ruling that the probative value of going into all of the Ingersoll–Rand case and its settlement was outweighed by the confusion it would have caused the jury. This would have resulted in a trial within a trial that would not have

been that helpful to the jury. *See* Fed. R.Evid. 403.

### 3. *Mitigation Jury Instruction*

LeeBoy contends that the instruction given to the jury regarding mitigation was misleading and entitles LeeBoy to a new trial because it failed to specifically state that DMI had the burden to prove Lee-Boy's reinstatement offer was for a lesser position, too risky, demeaning, or insecure. Upon review of Jury Instruction Number 17, the Court finds that it fairly and adequately represents the law of mitigation in South Dakota.

### C. *First Islamic*

### 1. *Generally*

██ LeeBoy contends that references to First Islamic Bank were unduly prejudicial to LeeBoy "in light of the September 11, 2001, attacks, the impending war with Iraq, and the ongoing conflict with other Islamic fundamentalists." (Doc. 319, p. 15.) The Court conducted the following voir dire on this issue:

> There will be some evidence that, not one of the parties, but that an entity that has some financial relationship with the defendant is a foreign corporation, and it is a foreign corporation in the middle east, and of course they are entitled to the same treatment as anybody else is.

Transcript of Court Voir Dire at p. 19. The Court asked the jurors if that would make a difference to any of them, and none indicated that it would. (*Id.*) As directed by the Court prior to trial, DMI's lawyer referred to First Islamic Bank during the trial solely to explain to the jury the sequence of events that led to Lee-Boy's termination of the dealership agreement with DMI. LeeBoy witnesses also

referred to First Islamic. The name was used in a business-like, fair manner. Lee-Boy has not shown that any references to First Islamic Bank appealed to any claimed bias of the jury.

### 2. *Closing Argument*

██ A new trial should be granted where the improper conduct of counsel in closing argument is "plainly unwarranted and clearly injurious." *Griffin v. Hilke,* 804 F.2d 1052, 1057 (8th Cir.1986). A failure to object to statements made during closing argument waives such an objection. *Billingsley v. City of Omaha,* 277 F.3d 990, 997 (8th Cir.2002). LeeBoy asserts that the closing argument of DMI's lawyer was prejudicial and a blatant appeal to jury bias because it referred to First Islamic's growth strategy and its representative not having South Dakota on his radar screen, and because he asked the jury to punish the "powers that be" which LeeBoy believes implicitly referred to First Islamic.[4] LeeBoy did not object during DMI's closing argument, so its objections are waived. Without an objection during argument, the Court has no opportunity to rule nor to admonish the jury if the situation warrants. Even assuming the objections were not waived by LeeBoy, the closing argument may have appealed to bias against out-of-state corporations and in favor of South Dakota corporations, but it did not appeal to any bias against First Islamic Bank based on its connection with or its location in the Middle East.

Moreover, the Court admonished the jury, at the beginning of trial and after the closing arguments, that statements made by the attorneys are not evidence. *See* Preliminary Jury Instruction No. 4 and Final Jury Instruction No. 3. The instruc-

---

**4.** Counsel for DMI claims that he was referring to the powers that be at LeeBoy in North Carolina. (Doc. 306 at 114.) LeeBoy contends that he was referring to the powers that be in Bahrain. (Doc. 280 at 21.)

tions remedied any alleged prejudice that may have resulted from the reference to the "powers that be." LeeBoy is not entitled to a new trial based on the references to First Islamic Bank.

### D. *Dan Healy Damages Testimony*

LeeBoy asserts that the jury's compensatory award for lost future profits was improper because it was based on the testimony of Dan Healy, the President of DMI, which they contend was improper "pseudo-expert testimony." (Doc. 280, p. 11.)

Rule 701 of the Federal Rules of Evidence provides:

**Rule 701. Opinion Testimony by Lay Witnesses**

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

LeeBoy argues that Dan Healy's testimony should not have been admitted because it "was based upon speculative, external opinions, not his knowledge of DMI's business." (Doc. 280, p. 11.)

In *Olson v. Aldren,* 84 S.D. 292, 170 N.W.2d 891, 895 (1969), the South Dakota Supreme Court held that the experience of the plaintiff/business owner allowed him to testify as to the lost profits of the business. The Eighth Circuit cited *Olson* with approval in *Pullman v. Land O'Lakes, Inc.,* 262 F.3d 759, 765 (8th Cir. 2001) (lay testimony from business owner sufficient to establish claim for lost profits). Dan Healy is one of the owners of DMI. He graduated from college in 1988 with a BS/BA in Business Administration.

TT at 555. After college, he began working in parts and service for DMI. TT at 556. After a couple of years with DMI, Dan Healy became the comptroller. *Id.* Later, he became the branch manager of the DMI dealership in Rapid City and held that position for about five years. TT at 557. In July of 2000 he moved back to Sioux Falls and became the President of DMI. *Id.* Dan Healy clearly was qualified to opine on DMI's lost profits.

LeeBoy argues that it is speculative for DMI to base its LeeBoy sales projections on the last ten years of DMI's historical performance because the DMI–LeeBoy dealership agreement lasted only eight months. Because his testimony was based on sales of similar equipment, the fact that only eight months of the ten year historical figures included LeeBoy sales does not render Dan Healy's testimony speculative. *See, e.g., Independent Business Forms, Inc. v. A–M Graphics, Inc.,* 127 F.3d 698, 704 (8th Cir.1997) ("Considering the close and continuous relationship between Independent and its sister company, IBF, Inc., the district court should have allowed Independent to develop and pursue its lost profits claim using IBF, Inc.'s profits to establish its own earning potential.").

LeeBoy further claims that DMI's claim for lost profits is speculative because there is no certainty regarding how many pavers it would have sold in the future. However, there was testimony that DMI sold two LeeBoy pavers during the eight month term of the agreement. In addition, testimony of LeeBoy representatives indicated that paver sales in South Dakota should average from three to five pavers per year. (Doc. 306, p. 45 n. 34 (citations to testimony))

According to LeeBoy, Dan Healy's assumption that damages would accumulate for ten years was unreasonable. Based on

his knowledge and experience with the company, Dan Healy testified that DMI represents a lot of manufacturers for ten years, and that it is reasonable to expect at least a ten year relationship with a manufacturer. TT at 587. Dan Healy was qualified to give his lay witness opinion regarding the ten-year damage projection. Whether it was reasonable was for the jury to decide.

■ LeeBoy states that the jury was misled into giving Dan Healy's testimony more weight than the testimony of LeeBoy's expert. However, once "the court admits the testimony, then it is for the jury to decide whether any, and if any what, weight is to be given to the testimony." *Sartor v. Arkansas Nat. Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944). The trier of fact is entitled to weigh the credibility of the witness and to value his testimony in light of his demeanor on the stand. *Id.* at 627–628, 64 S.Ct. 724. The record contains ample evidence of Dan Healy's experience in the business of selling pavers and similar products, and of the knowledge he possessed about DMI's business records that allowed him to assess DMI's future lost profits resulting from the termination of the dealership agreement with LeeBoy. His opinions were admissible under Fed.R.Evid. 701 as opinions of a lay witness, and he was subject to vigorous cross-examination. Questions of credibility and weight are for the fact-finder. In the present case, the jury chose to believe Dan Healy and there is no reason to set aside its decision.

### E. *Bruce Burton's Discount Rate*

Bruce Burton, LeeBoy's damages expert, used a two-step analysis to calculate a present value discount rate of 17.5%. First he determined the interest rate or return that DMI could reasonably be expected to receive on an investment of the lump-sum payment. Next he increased that interest rate by an amount he determined by considering the risks and uncertainties associated with DMI's cash flow. After initially overruling Plaintiff's objection to this testimony, the Court reversed its ruling and disallowed Mr. Burton's testimony regarding the second step of his analysis and the 17.5% discount rate. LeeBoy claims it was error to strike that testimony.

South Dakota Pattern Jury Instruction 30–07–2 explains the purpose of the present value reduction, and how it is calculated in South Dakota. The Court gave that instruction to the jury with a few modifications to fit the facts of this case:

If you should find that the Plaintiff is entitled to a verdict, and further find that the evidence in the case establishes a reasonable likelihood of loss of future profits, then it becomes your duty to ascertain the present value in dollars of such future damage, since the award of future damages necessarily requires that payment be made now for a loss that will not actually be sustained until some future date.

Under these circumstances, the result is that the Plaintiff will in effect be reimbursed in advance of the loss, and so will have the use of money which the Plaintiff would not have received until some future date, but for the verdict.

In order to make a reasonable adjustment for the present use of money representing a lump-sum payment of anticipated future loss, the law requires that you discount, or reduce to its present value, the amount of the anticipated future loss, by taking (1) the interest rate or return which such Plaintiff could reasonably be expected to receive on an investment of the lump-sum payment together with (2) the period of time over which the future loss is reasonably certain to be sustained; and then reduce, or

in effect deduct from, the total amount of future loss that amount which would be reasonably certain to earn or return, if invested at such rate of interest over such period of time; and include in the verdict an award for only the present worth-the reduced amount-on anticipated future loss.

This computation is made by using the so-called "present-value" table which is attached to this instruction for your use.

There has been evidence presented to you concerning the claim for future lost profits in the form of expert opinion testimony and testimony by the Plaintiff. However, it is your duty to determine whether the expert's or the Plaintiff's adjustment for present value was reasonable, and if not, you should make your own adjustment for present value.

Finally, in determining the present value of future damages, you may also take into consideration the effect of inflation or deflation on the future damages.

(Doc. 274, Jury Instruction No. 16.) The remainder of the instruction explained how to use the present value table and gave an example of its use to the jury. (*Id.*)

During Mr. Burton's testimony, this Court held that the South Dakota pattern jury instructions do not contemplate the second step of his present value calculation. TT at 955. The Court stated that not only is it confusing to the jury, but it assumes that the money would be put back into the business. *Id.* at 956. It remains the finding of the Court that Mr. Burton's testimony regarding the increased discount rate for "riskiness" of DMI's future sales was properly excluded under South Dakota law.

### F. *Punitive Damages*

LeeBoy claims that the Court erred in submitting the question of punitive damages to the jury, and it alleges that the punitive damage award is excessive in violation of the Constitution.

### 1. *Submission of Punitive Damage Claim to Jury Under SDCL § 21–1–4.1*

SDCL § 21–1–4.1 requires the trial court to find by clear and convincing evidence that there is a reasonable basis to believe defendant acted wilfully, wantonly or maliciously before submitting the issue of punitive damages to the jury. This burden "is a preliminary, lower-order quantum of proof than must be established at trial." *Case v. Murdock*, 488 N.W.2d 885, 891 (S.D.1992). *See* this Court's opinion in *Connie Issendorf, d/b/a/ Golden Cadillac Lounge and Supper Club v. Capitol Indemnity Corp.*, CIV 93–1101 (D.S.D. May 3, 1994). Malice is an essential element of a punitive damages claim, but it may be shown by either actual or presumed malice. "Actual malice is a positive state of mind, evidenced by the positive desire and intention to injure another, actuated by hatred or ill-will towards that person." *Isaac v. State Farm Mut. Auto. Ins. Co.*, 522 N.W.2d 752, 761 (quoting *Dahl v. Sittner*, 474 N.W.2d 897, 900 (S.D. 1991)). Presumed malice is malice that may be imputed if the person acts willfully or wantonly to the injury of the other. *See Isaac*, 522 N.W.2d at 761. Malice, however, " 'is not simply the doing of an unlawful or injurious act, it implies that the act complained of was conceived in the spirit of mischief or of criminal indifference to civil obligations.' " *Id.* (quoting *Dahl*, 474 N.W.2d at 900).

After carefully reviewing the entire file for the purpose of ruling on the parties' motions for summary judgment, and after reviewing the brief submitted by DMI for its showing under SDCL § 21–1–4.1 (doc. 234), the Court found that the lower-order quantum of proof required by

SDCL § 21–1–4.1 had been met so that DMI should be allowed to present evidence of punitive damages at trial. This decision was further supported by evidence admitted at trial.

Prior to trial, the Court knew that John Knuths, LeeBoy's representative at trial and the President of Rosco, testified before the South Dakota legislature regarding amendments to the South Dakota Dealership Protection Act. (Doc. 107, Plaintiff's Statement of Facts in Support of Motion for Summary Judgment, ¶¶ 174–176.) He gave LeeBoy representatives a copy of the South Dakota franchise laws when they were discussing termination of the dealership agreement with DMI. *Id.* LeeBoy's Vice President testified that he glanced at a copy of the dealer franchise laws, and that he considered the harm DMI might suffer if LeeBoy terminated the franchise. (Majeski depo. at 59; TT at 409.) He believed termination might result in a loss of $50,000 to $70,000 for DMI, but that it would not have a "major impact into their business." (Majeski depo. at 60; TT at 409–410.) At trial, Mr. Majeski was asked, "So you just thought [going forward with the termination of the agreement with DMI] might violate the law, but you weren't sure, but you didn't get any, you didn't seek out any advice on it, is that right?" He answered, "That's correct." (TT at 790.) Ed Underwood, a board member of LeeBoy[5] testified in his deposition, portions of which were read at trial, that he knew dealers are protected by laws on a state-by-state basis, but he did not know the specific laws applicable in South Dakota and he did not ask any questions about the law when dealer termi-

nations were discussed. (Underwood depo. at 104; TT at 443.) He admitted that South Dakota is not big on his map. (Underwood depo. at 94; TT at 442.)

LeeBoy contends that malice cannot be presumed in this case because it did not take the same actions as those of the defendant in *Groseth Int'l, Inc. v. Tenneco, Inc.*, 410 N.W.2d 159 (S.D.1987), *aff'd in part and remanded in part*, 440 N.W.2d 276 (S.D.1989). However, every case is different and presumed malice takes many different forms. Simply put, there is evidence from which a reasonable jury could have found that LeeBoy officers or employees knew, or should have known, that their conduct was in direct violation of South Dakota statutes, and would naturally and probably result in injury to DMI, and that LeeBoy nevertheless continued such conduct in reckless disregard of the consequences, from which malice can be inferred. Thus it was proper to allow DMI to present its punitive damages claim to the jury.

### 2. Constitutionality of Punitive Damages

First relying on *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and then on *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003),[6] LeeBoy contends that the $4,335,000 punitive damage award exceeds the bounds of constitutionality. LeeBoy asserts that the award should be reduced because its conduct was not reprehensible, the 6.5–to–1 ratio of punitive to actual damages is excessive,

---

5. Ed Underwood explained that LeeBoy is a portfolio company of Crescent Capital and Mr. Underwood also serves as the executive director of Crescent Capital. (TT at 422–423.) Crescent Capital is in the business of evaluating potential acquisitions for First Islamic, an investment bank. (TT at 424.)

6. The *State Farm* decision was issued on April 7, 2003, after briefing on the pending motions had been completed. The parties submitted supplemental briefs addressing the impact of State Farm on the pending motions. (Docs. 329, 332.)

and the amount exceeds awards given in similar cases.

In *BMW, supra,* the Supreme Court for the first time struck down an award of punitive damages as excessive under the Due Process Clause of the Fourteenth Amendment. In that case, an Alabama purchaser of a new BMW automobile sued the manufacturer for its failure to notify him that portions of his automobile had been repainted. Under BMW's policy, it sold unused but repaired cars as new unless the cost of the repair exceeded three percent of the car's suggested retail price. It gave the purchasers, including plaintiff, no notification of the repainting because the cost of that repair did not meet the policy's minimum. The plaintiff claimed that the repainting impaired the car's value by approximately ten percent of the $40,000 price, or $4,000 in actual damages, and introduced evidence that BMW had sold nearly one thousand repainted cars. The plaintiff argued that the appropriate penalty was $4 million. *See id.,* 517 U.S. at 563–64, 116 S.Ct. 1589.

Alabama law permitted an award of punitive damages when a defendant engaged in "gross, oppressive or malicious fraud." *Id.* at 565, 116 S.Ct. 1589. The jury concluded that BMW's nondisclosure policy constituted such fraud, and awarded both the requested actual damages and the $4 million in punitive damages. *Id.* The Alabama Supreme Court reduced the punitive damage award to $2 million because the jury's calculation included sales in other jurisdictions. It upheld the award in all other respects. *Id.* at 566–67, 116 S.Ct. 1589. The Supreme Court reversed. The Court reaffirmed the states' traditional authority to punish and deter wrongdoers for acts committed within the jurisdiction, and noted that states have "considerable flexibility" in achieving those goals. *Id.* at 568, 116 S.Ct. 1589. However, it cautioned that a state must avoid "grossly excessive" awards that "enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." *Id.* Observing that "[e]lementary notions of fairness" require "fair notice" to a defendant of both the conduct punishable and the severity of the potential penalty, the Court identified three guideposts for determining the reasonableness of a punitive damages award: the degree of reprehensibility of the conduct; the disparity between the harm or potential harm suffered and the punitive damages award; and the difference between the punitive damages and the civil penalties authorized or imposed in comparable cases. *Id.* at 574–75, 116 S.Ct. 1589.

The Court considered the degree of reprehensibility to be "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." *Id.* at 575, 116 S.Ct. 1589. The Court observed that "some wrongs are more blameworthy than others" so that " 'trickery and deceit' . . . are more reprehensible than negligence." *Id.* at 575–76, 116 S.Ct. 1589. It concluded that none of the aggravating factors were associated with BMW's conduct and observed that the plaintiff's injury was "purely economic in nature." *Id.* at 576, 116 S.Ct. 1589. The Court stated that although intentional economic misconduct warrants punishment, particularly if inflicted on a financially weak and vulnerable entity, "this observation does not convert all acts that cause economic harm into torts that are sufficiently reprehensible to justify a significant sanction in addition to compensatory damages." *Id.* Although punitive damages were warranted because BMW had intentionally omitted a material fact, the fact that the company also could have believed that it had no disclosure duty mitigated the egregiousness of the conduct.

"The second ... indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *Id.* at 580, 116 S.Ct. 1589. The Court observed that it had looked to the ratio between the punitive and compensatory damages on other occasions. In *Pacific Mutual Life Insurance Co. v. Haslip*, 499 U.S. 1, 23–24, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), it had held that a four-to-one ratio did not "cross the line into the area of constitutional impropriety," and in *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 460, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), it had held permissible a ratio that did not exceed ten to one once the potential harm to that plaintiff was taken into account. In considering the ratio guidepost, the Court observed that:

> [L]ow awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.

*BMW*, 517 U.S. at 582, 116 S.Ct. 1589. In *BMW*, the Court followed its practice of declining to "draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." *Id.* at 583, 116 S.Ct. 1589 (citation omitted). Rather, it stated that the concern should be for reasonableness. *Id.* In the case of the plaintiff purchaser of the BMW, the $2 million punitive damages award produced what the Court described as "a breathtaking 500 to 1" ratio between the penalty and plaintiff's actual damages, *id.* at 583, 116 S.Ct. 1589, and was thirty-five times greater than the total damages of all fourteen Alabama purchasers, *id.* at 582 n. 35, 116 S.Ct. 1589.

Finally, in discussing the third indicium of excessiveness, a comparison of the punitive damages and the potential civil or criminal penalties for comparable misconduct, the Court suggested that the appropriate comparison is between the statutorily authorized financial penalty (when there is no imprisonment) and the punitive damages award. In explaining its decision to reverse the judgment on punitive damages and remand, the Court noted that BMW lacked any notice that its conduct, which would have given rise to a $2,000 fine under the state's Deceptive Trade Practices Act, Ala.Code § 8–19–11(b) (1993), could result in a multimillion dollar penalty, and that there was no basis for assuming that BMW, which did promptly change its policy after the verdict, *id.* at 566, 116 S.Ct. 1589, would not have done so after receiving a lesser sanction. *Id.* at 584–85, 116 S.Ct. 1589. The Court refused to draw "a bright line marking the limits of a constitutionally acceptable punitive damages award," but the Court was convinced that the award in *BMW* was "grossly excessive." *Id.* at 585, 116 S.Ct. 1589.

In *State Farm, supra,* the Supreme Court held that a $145 million punitive damage award with $1 million in compensatory damages violated due process. That case involved a bad faith action against State Farm for failure to pay a third-party claim against its insureds, the Campbells. The jury awarded the Campbells $2.6 million in compensatory damages and $145 million in punitive damages. *See id.,* 123 S.Ct. at 1519. The trial court reduced the damage awards to $1 million in compensatory damages and $25 million in punitive damages. *Id.* The Utah Supreme Court reversed the trial court's reduction of punitive damages and reinstated the $145 million award. *Id.*

On appeal, the United States Supreme Court elaborated on the three guideposts

for reviewing punitive damages, reiterating that the most important guidepost is the degree of reprehensibility of the conduct. The Court highlighted guidelines for determining reprehensibility:

> We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect.

*Id.* at 1521. The Court held that the Utah courts erred in relying on evidence of nation-wide reprehensible conduct by State Farm that had no nexus to the specific harm suffered by the Campbells. *Id.* at 1521–1524. The conduct that harmed the Campbells was the only conduct relevant to the reprehensibility analysis because there was no other conduct by State Farm elsewhere which was similar to that which harmed Campbells. *Id.* at 1524.

Regarding the second guidepost, the ratio between the compensatory and punitive damages, the Court indicated that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 1524.

> Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic dam-

ages. The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.

\* \* \* \* \* \*

In the context of this case, we have no doubt that there is a presumption against an award that has a 145–to–1 ratio. The compensatory award in this case was substantial; the Campbells were awarded $1 million for a year and a half of emotional distress. This was complete compensation. The harm arose from a transaction in the economic realm, not from some physical assault or trauma; there were no physical injuries; and State Farm paid the excess verdict before the complaint was filed, so the Campbells suffered only minor economic injuries for the 18–month period in which State Farm refused to resolve the claim against them.

*Id.* at 1524–1525.

The Court did not dwell on the third guidepost, the disparity between the punitive damages award and the civil penalties authorized or imposed in comparable cases. It simply noted that the most relevant civil sanction under Utah law appeared to be a $10,000 fine for an act of fraud, "an amount dwarfed by the $145 million punitive damages award." *Id.* at 1526. The Court reversed and remanded the case to the Utah Supreme Court for a proper calculation of punitive damages, noting that application of the guideposts "likely would justify a punitive damages award at or near the amount of compensatory damages." *Id.* at 1526.

The Supreme Court's decisions in *BMW* and *State Farm* provide the framework to consider whether the $4,335,000 punitive damage award in the present case is unconstitutionally excessive. For further guidance, this Court has also examined a number of Eighth Circuit cases applying the *BMW* criteria.

In *Dean v. Olibas*, 129 F.3d, 1001 (8th Cir.1997), the Court upheld a $70,000 punitive damage award with a ratio of fourteen to one compared to compensatory damages. Olibus was a bail bondsman who initiated proceedings against Dean knowing that he was not person who had obtained bond. Dean was arrested for a crime he did not commit. Dean subsequently sued Olibas for causing his arrest, claiming malicious prosecution, false imprisonment, and violation of his civil rights. The case was tried before a jury in federal court. Olibas was found liable on each of the three claims and Dean was awarded $5,000 in compensatory damages and $70,000 in punitive damages. The Eighth Circuit held that Olibas's conduct had some the characteristics that justify the imposition of "substantial" punitive damages:

> Most important, his misconduct was intentional: he had Dean arrested for a crime he knew Dean did not commit, so that he could save himself $1500.... In addition, Olibas inflicted significant non-economic harm on Dean.... Dean was eating dinner with his wife and children when police arrested him, took him to the police station, confiscated some of his property, and detained him for several hours against his will. He subsequently was required to attend court hearings on two different days. In sum, the nature of Olibas's misconduct does not require use to conclude that the

punitive damages assessed against him were unconstitutional.

*Id.* at 1006–1007 (citations omitted).

In *Watkins v. Lundell*, 169 F.3d 540 (8th Cir.1999), the Court reversed a punitive damage award of $3,500,000 against Terry Lundell, who had contracted to sell land to the Watkins but failed to do so after taking Watkins' vintage Ferrari Testarossa, valued at $200,000, as a downpayment. The Watkins filed an action for breach of contract and fraud. In settlement of the lawsuit, the Lundells agreed to make several payments to the Watkins over time, with interest, and to obtain a life insurance policy naming the Watkins as beneficiaries. Terry Lundell provided a confession of judgment, to be filed in the event of default. The Lundells defaulted and the Watkins filed the confession of judgment, followed by an action for breach of the settlement agreement and fraud in inducing the settlement. The Watkins received a default judgment for actual damages of $235,000 and punitive damages of $3,500,000, a ratio of almost fifteen to one. After the trial court refused to set aside the default judgment under Federal Rule of Civil Procedure 60(b)(6), the Lundells appealed. The Eighth Circuit discussed the reprehensibility of the Lundells' conduct, finding that it was more reprehensible than mere negligence:

> It is a fair inference, based on previous conduct, conduct during the settlement, and subsequent conduct, that Terry Lundell induced the settlement agreement knowing he would never pay any amount. Terry Lundell also gave worthless property as security and false assurances. He has repeatedly attempted to avoid and to delay his obligations in detriment to the rights of the Watkins.

*Id.* at 546. The Court noted that the ratio of punitive damages to the actual damages

was "very high." *Id.* The Court found Terry Lundell's actions similar to those of the defendant in *Haslip, supra,* a case involving fraud by an insurance agent where the Supreme Court found that a 4-to–1 ratio was "close to the line" of constitutional impropriety. *Id.* The court noted that both sides were "sophisticated and represented by counsel." *Id.* As to the third indicia of reasonableness, the Court noted that the maximum fine for fraudulent practices under Iowa law is $10,000. *Id.* After reviewing the three *BMW* guideposts and the wealth of the defendants ($11,000,000 net worth), the Court held that the punitive damage award should not exceed a 4–to–1 ratio ($940,000). *Id.* at 547.

In a case against an owner of an apartment complex who had an established pattern of denying rental applications based on the race of the applicants, the Eighth Circuit upheld a punitive to compensatory damage ratio of 100–to–1, holding that the owner's systematic and deliberate exclusion of an entire race of people in contravention of society's goal to provide housing free of racial bias called for "society's full rebuke and condemnation." *United States v. Big D. Enterprises, Inc.,* 184 F.3d 924, 933 (8th Cir.1999). Regarding the ratio, the Court stated that:

> The relative strength or weakness of the other factors naturally impacts upon the acceptability of the punitive to compensatory damage award ratio. In cases where the other factors are weak, a 4 to 1 ratio may test the outer limits of acceptability. In cases where the other factors are strong, a 526 to 1 ratio may be appropriate.

*Id.* at 933 (citing *Haslip, supra,* and *TXO, supra* ). The defendant's reprehensible conduct and the fact that the FHA permits courts to impose a fine up to $50,000 in addition to compensatory and punitive damages outweighed the high ratio of punitive to compensatory damages. *Id.*

In *Grabinski v. Blue Ford Sales, Inc.,* 203 F.3d 1024 (8th Cir.2000), the Eighth Circuit affirmed a collective punitive to compensatory damage ratio of 27–to–1. The facts of *Grabinski* are similar to *BMW.* The defendants sold Grabinski a 1984 GMC Jimmy that had been damaged in a collision, saying it was in "A–1" condition and had never been in a wreck. *Grabinski v. Blue Ford Sales, Inc.,* 136 F.3d 565, 567 (8th Cir.1998) (*Grabinski I.*) About a week after the sale, the engine began overheating. Grabinski had the Jimmy repaired, but it continued to lack power, sway and have low gasoline mileage. *Id.* at 568. Defendants offered to repurchase the Jimmy at a substantial price reduction. *Id.* Grabinski filed suit, alleging fraud. Defendants then offered to repurchase the Jimmy for the sale price and some costs, less depreciation. The offer was contingent on dismissal of the lawsuit. *Id.* Grabinski refused the offer. The jury awarded Grabinski total actual damages of $7,835, and total punitive damages of $210,000, with varying amounts awarded against each of the five defendants. *Id.*

In the second *Grabinski* appeal, the Eighth Circuit considered the reprehensibility of the defendants' conduct and found that their concealment of prior wreck damage and other defects was egregious and "demonstrated a clear and disturbing disregard for Grabinski's safety and her economic interests." 203 F.3d at 1027. The Court noted that Missouri law allows for significant civil and criminal sanctions for fraud and concealment which weighed in favor of an award of punitive damages.[7]

---

**7.** The Court cited to Mo.Ann.Stat. § 407.100.6, authorizing a civil penalty of up to $1,000 for each violation, and Mo.Ann.Stat. § 407.020.3, providing that a person who,

"with the intent to defraud," "willfully and knowingly engages" in any violation of the Missouri Merchandising Practices Act is

*Id.* at 1026. Considering these factors, the Eighth Circuit agreed with the trial court that the award of punitive damages was "generous" but not grossly excessive. *Id.* at 1027.

The Eighth Circuit upheld a 1.8–to–1 ratio in *Foster v. Time Warner Entertainment Co.*, 250 F.3d 1189 (8th Cir. 2001).[8] Foster opposed the removal of an accommodation (a flexible schedule) for a disabled Time Warner employee she supervised, and subsequently opposed that employee's termination. Foster claimed that she was terminated in retaliation for opposing unlawful discrimination under the Americans with Disabilities Act (ADA). The jury awarded her $33,515.28 for lost wages and benefits, $75,000 in compensatory damages, and $136,000 in punitive damages. *Id.* at 1194. The Eighth Circuit noted the evidence that Time Warner managers knew that the employee was covered by the ADA and that the company's manual listed a flexible schedule as a reasonable accommodation. Foster reminded the managers on numerous occasions that the employee was covered by the ADA and should receive an accommodation. One of the managers told Foster not to worry about the ADA, that it was none of her business, and said things like," we don't have to follow the ADA" and "I don't care about the policy." *Id.* at 1197. The Court held that the punitive damage award was supported by the evidence, was only 1.8 times the actual damages, and was not dissimilar to other awards approved in employment discrimination cases. *Id.* (citing *Kimbrough v. Loma Linda Dev., Inc.*, 183 F.3d 782, 785 (8th Cir.1999))(upholding a ratio of 10–to–1).

The first guidepost for determining the constitutionality of the punitive damage award in this case requires the Court to consider the degree of reprehensibility of LeeBoy's conduct. DMI listed eleven main points regarding reprehensibility of LeeBoy's conduct:

1. LeeBoy knew all about dealer protection laws, their restrictions on terminations, and about South Dakota law in particular;

2. LeeBoy knew termination would injure DMI;

3. LeeBoy terminated other dealers without notice thereby showing a pattern of disrespect for dealer protection laws;

4. Trickery, deceit, concealment and improper motive are all reprehensible behavior exhibited by LeeBoy;

5. The improper motives for termination included "prejudice" against DMI and South Dakota;

6. LeeBoy intentionally breached its promise to DMI in the Dealer Agreement;

7. LeeBoy knew the Rosco acquisition was eminent and that it would trigger dealer consolidations before finalizing the relationship with DMI, but concealed this information;

8. The corporate wrongdoing was at the highest levels; this is not a case of *respondeat superior;*

9. Another reason LeeBoy wanted to consolidate dealers-besides positioning for a IPO or a sale in the medium term-was to gain clout over dealers so it could "influence" dealers to purchase more equipment, which is illegal in South Dakota;

10. DMI did nothing wrong and was completely innocent;

guilty of a felony punishable by up to five years in prison and a fine of up to $5,000.

**8.** This Court sat on the panel by designation.

11. There was no legitimate detriment caused to LeeBoy by not terminating DMI.

(Doc. 306, p. 91–109.)

In reply, LeeBoy contends that there is no evidence that anyone involved in DMI's termination knew the Act limited LeeBoy's ability to terminate DMI. (Doc. 319, p. 30.) LeeBoy also asserts that it did not know in November of 2001 when it reached an agreement with DMI that the Rosco acquisition would trigger dealer consolidations, (*id.* at 31), and that, when the decision was made to terminate DMI, LeeBoy believed DMI could mitigate any damages by becoming a dealer for another manufacturer (*id.* at 28).

The Court agrees with DMI that a reasonable jury could have found that Lee-Boy's conduct was reprehensible. Although this case involves economic harm rather than physical harm and DMI is not financially vulnerable, LeeBoy demonstrated a pattern of misconduct and the harm was intentional and not a mere accident or negligence. LeeBoy could not have reasonably believed termination of DMI would not violate South Dakota law. The Supreme Court has noted: "[I]nfliction of economic injury, especially when done intentionally through affirmative acts of misconduct ... can warrant a substantial penalty." *BMW*, 517 U.S. at 576, 116 S.Ct. 1589. Like the defendants in *Grabinski, supra*, LeeBoy demonstrated a disturbing disregard for DMI's economic interests. Unlike in *State Farm, supra*, the nationwide reprehensible conduct by DMI bore a nexus to the specific harm suffered by DMI.

The nexus of the other dealer terminations to the termination of DMI was clearly demonstrated during the trial. Calvin (Kelly) Majeski, Vice President of sales and marketing for LeeBoy, testified that the company officials had meetings in May and June 2001 to discuss consolidation of LeeBoy and Rosco. (TT at 757–761.) They decided to terminate some of their dealers. Majeski received a copy of a book of state dealer protection laws in June and he "took a review of the book." [9] (TT 771–72.) Majeski and Bryce Davis worked together to make all of the calls about the consolidation to LeeBoy's dealers within thirty days in July, 2001. (TT at 782.) Majeski thinks he terminated "half a dozen" dealers. (TT at 776.) Bryce Davis, a regional sales manager for LeeBoy, testified that he was responsible for terminating ten dealers. (TT at 492, 528–29.) Davis made notes of his conversations with the dealers. Some of his notes were missing, but the notes that Davis did have (which were produced to DMI only days before trial) reflect that he made termination calls beginning on July 12, 2001 and continuing until at least until July 18, 2001. (TT 495; 514; Trial Exhibit 87.) The notes indicate that some of the terminated dealers were very angry and some threatened litigation. (TT at 507–514.) Davis reported these conversations to his supervisors, including Majeski, in LeeBoy's home office. (TT at 508; 511; 788.) The following colloquy took place at trial between DMI's lawyer and Majeski:

Q. So even though you have gotten this big brouhaha with McDonald, and you have the statement that Rhode Island is a tough state to cancel, you know all about the dealer laws you have talked about previously in direct examination, that didn't prevent you from continuing on with this cancellation policy did it?

A. A policy of consolidations.

---

9. On cross examination Majeski said he "read through the first couple of pages for them and kept them for records, for a file." (TT at 790.)

**1050**

Q. Consolidations, termination policy, it didn't slow you down, did it?

A. We are doing what ever made good business sense.

(TT at 788–89.) The evidence demonstrated a nexus between the termination of DMI and other dealership terminations that occurred within what appeared to be less than a thirty day period.

The second guidepost to determining reasonableness of punitive damages is the disparity between the harm and the punitive and the compensatory damages. The ratio here is 6.5-to-1. It is within the range of a 1:4 to a 1:10 ratio mentioned by the Supreme Court in *BMW* and *State Farm*, and it is much lower than the ratio in many of the awards affirmed by the Eighth Circuit.

The third guidepost is the difference between the punitive damage award and state civil and criminal penalties imposed in similar cases. If punished criminally, LeeBoy's conduct would have subjected it to one year imprisonment in a county jail or a one thousand dollar fine, or both. *See* SDCL §§ 37–5–3, 22–6–2. The civil liability for wrongful termination of a dealer franchise in violation of SDCL § 37–5–3 is "all damages caused to such dealer by such violation." *See* SDCL § 37–5–4. This suggests that LeeBoy was on notice that its conduct could give rise to liabilities beyond compensatory damages.[10]

The Court is mindful that DMI suffered only economic harm and that the facts in the present case do not include an act of violence, disregard for the health or safety of others, or the exploitation of a financially vulnerable target. However, it is evident that the jury's punitive damage award turned on an evaluation of the Lee-Boy witnesses involved in the decision to terminate the agreement with DMI. The facts show that they either knew that the termination would violate South Dakota law, or at the very least they suspected that it would but did not make any effort to look into it, all the while knowing that DMI would suffer economic damages as a result of the termination. It was not until after DMI threatened litigation that Lee-Boy suggested that DMI's sales performance had been poor. Although the ratio of punitive to compensatory damages exceeds four to one, it is less than the ratios that have been upheld by the Supreme Court and the Eighth Circuit. After examining the constitutionality of the punitive damages award in light of Supreme Court and Eighth Circuit precedent, the Court finds that the award in this case does not exceed the Due Process Clause.

10. In its opening brief, Leeboy compares the punitive damage award in this case to the $1.6 million awarded by the jury and reviewed by the South Dakota Supreme Court in *Groseth International, Inc. v. Tenneco, Inc.,* 440 N.W.2d 276 (S.D.1989) (*Groseth II*). Leeboy asserts: "In *Groseth I*, the Supreme Court of South Dakota reversed as excessive an award of $1.6 million in punitive damages in a suit under the Act." (Doc. 280, p. 20.) In fact, *Groseth I* had nothing to do with punitive damages. In *Groseth I*, the Supreme Court of South Dakota reversed the trial court's grant of summary judgment in favor of the defendant on the plaintiff's claim for breach of franchise agreement. *See Groseth International, Inc. v. Tenneco, Inc.,* 410 N.W.2d 159, 168 (S.D.1987) (*Groseth I*). In *Groseth II*, the Court reversed the jury's compensatory damage award because it was based on loss of gross profits rather than net profits. Because the amount allowed in compensatory damages was a factor the jury considered in awarding punitive damages, and because compensatory damages were improperly measured, the Court reversed the punitive damages for retrial along with the compensatory damages. *Groseth II*, 440 N.W.2d at 278. The Court did not find that the $1.6 million in punitive damages was unconstitutionally excessive.

### 3. *Remittitur of Punitive Damages*

LeeBoy's arguments relate to the constitutionality of the punitive damage award, yet LeeBoy seeks a remittitur. LeeBoy fails to recognize that if the Court were to reduce the verdict as a matter of constitutional law, it would not need to issue a remittitur or otherwise obtain DMI's consent to the reduction. *See Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041 (8th Cir.2002). The *Ross* court explained:

> A constitutionally reduced verdict ... is really not a remittitur at all. A remittitur is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages. The court orders a remittitur when it believes the jury's award is unreasonable on the facts. A constitutional reduction, on the other hand, is a determination that the law does not permit the award. Unlike a remittitur, which is discretionary with the court ... a court has a mandatory duty to correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due process clause.

*Ross*, 293 F.3d at 1049 (quoting *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1331 (11th Cir.1999)). For the reasons set forth above, the Court has determined that the punitive damage award is not unconstitutionally excessive. The Court will now address whether the punitive damage award is excessive and should be remitted based on state law.

"In reviewing an award of punitive damages, the role of a district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered." "District courts must undertake an independent review of the evidence to determine whether it supports punitive damages." *Gorman v. Easley*, 257 F.3d 738,

749 (8th Cir.2001), *rev'd sub nom on other grounds*, 536 U.S. 181, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002).

Under South Dakota law, the amount of punitive damages rests largely within the discretion of the jury. *Davis v. Merrill Lynch, Pierce, Fenner & Smith*, 906 F.2d 1206, 1223 (8th Cir.1990). South Dakota courts apply five factors to determine wither a punitive damage award is excessive: (1) the amount allowed in compensatory damages, (2) the nature and enormity of the wrong, (3) the intent of the wrongdoer, (4) the wrongdoer's financial condition, and (5) all of the circumstances attendant to the wrongdoer's actions. *Leisinger v. Jacobson*, 651 N.W.2d 693, 699–700 (S.D.2002) (analysis of the five factors under South Dakota law required reduction of $120,000 punitive damage award, with a ratio of 9 to 1 to actual damages, to $25,000); *Fritzmeier v. Krause Gentle Corp.*, 669 N.W.2d 699, 2003 SD 112, at *8–9 (D.S.D.2003).

The first factor, the amount of compensatory damages awarded in relation to the amount of punitive damages, was analyzed in the previous section of this Memorandum Opinion regarding the constitutionality of the punitive damage award. The South Dakota Supreme Court has stated that "there is no precise mathematical ratio between compensatory and punitive damages." *Grynberg v. Citation Oil & Gas Corp.*, 573 N.W.2d 493, 504 (S.D.1997). The ratio of 6.5 to 1 is within the realm of ratios upheld by the South Dakota Supreme Court. *See, e.g., Schaffer v. Edward D. Jones & Co.*, 552 N.W.2d 801, 810 (S.D.1996) (30 to 1 ratio upheld for economic loss on an investment); *K & E Land & Cattle, Inc. v. Mayer*, 330 N.W.2d 529, 532 (S.D.1983) (upholding a ratio of 35 to 1 when neighbor intentionally tore down a fence). This factor weighs in favor of upholding the punitive damage verdict.

The second factor requires the Court to measure the nature and enormity of the wrong. The harm to DMI was purely economic as opposed to physical; LeeBoy put no one's health or safety at risk. DMI does not deny that LeeBoy equipment represented less than 1% of DMI's sales in 2001. LeeBoy's cancellation of the dealership did not threaten to put DMI out of business. DMI was fully compensated for the damages suffered as a result of Lee-Boy's conduct. This factor weighs in favor of finding the punitive damage award excessive.

The Court next examines the intent of LeeBoy. The South Dakota Supreme Court stated in *Veeder v. Kennedy*, 589 N.W.2d 610 (S.D.1999):

> From intent, we determine 'the degree of reprehensibility of the defendant's conduct,' which is viewed as probably the most important indication of the reasonableness of the punitive damage award. *Schaffer II*, 1996 SD 94 at 32, 552 N.W.2d at 812 (citing *BMW of North America v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589, 1599, 134 L.Ed.2d 809, 826). Trickery and deceit are more reprehensible than negligence. *Id.* Of a more serious nature would be those acts which result in injury to persons through 'indifference to and reckless disregard for the health or safety of other.' *See BMW*, 517 U.S. at 576, 116 S.Ct. at 1599, 134 L.Ed.2d at 826. The most reprehensible from the intent point of view would be an intentional malicious assault or attack against a person. *Grynberg*, 1997 SD 121, 573 N.W.2d at 506. (Footnote omitted).

This factor requires the same analysis as the first constitutional "guidepost." The Court has already noted that LeeBoy demonstrated a pattern of misconduct in disregard for DMI's economic interests so that a jury could have found LeeBoy's conduct reprehensible. There is evidence that LeeBoy knew about dealer protection laws in general, their restrictions on terminations, and that LeeBoy even had a copy of South Dakota's dealer protection laws which was not just laying around someplace, but had been brought to their attention by John Knuths, LeeBoy's representative at trial and the President of Rosco. As was noted in *Schaffer, supra*, 552 N.W.2d at 812 (a 30 to 1 ratio economic loss case), this was not a case "where management was unaware of the wrongdoing by a subordinate...." but was a decision made and carried out by the senior management of the company. DMI presented evidence that LeeBoy knew termination of the franchise agreement would cause DMI to suffer some damage. The evidence also showed that LeeBoy terminated other dealers without notice and that some of those dealers expressed their dissatisfaction and threatened to sue but, despite these threats and the law, LeeBoy adhered to its termination policy with the exception that after this lawsuit was started they offered to reinstate DMI's contract. LeeBoy's knowledge about dealer protection laws and about the harm that DMI would suffer calls for punitive damages as punishment. The Court finds that this factor supports the jury's punitive damage award.

The fourth factor is the financial condition of Defendant B.R. Lee Industries, Inc. (LeeBoy). On January 25, 2000, Lee Holding Company acquired 84% of the common stock of B.R. Lee Industries, Inc., for $74,700,000 during the relevant time period. The evidence indicated that this was a purchase by a sophisticated investor and the evidence further indicated that through the time of trial LeeBoy had maintained its preeminent position in the industry both as to market share and product quality. There was no evidence as to what the remaining 16% minority interest in LeeBoy was worth. The 16% minor-

ity interest surely has value, but this Court will not assume it has the same value per share as the majority interest that was purchased for $74,700,000. The jury was entitled to conclude from the evidence that LeeBoy had a net worth of at least $74,700,000. The Court concludes from the evidence that $74,700,000 is the figure that should be used to analyze the financial condition of LeeBoy. There was uncontradicted testimony as to LeeBoy's strong market dominance, but no evidence regarding LeeBoy's gross or net profits.

In *Schaffer*, 552 N.W.2d at 810, the South Dakota Supreme Court said that "[p]unitive damages must not be so oppressive or so large as to shock the sense of fair-minded persons." This award, although generous and punitive, does not shock the Court after observing the trial. The Court has also stated that "the purpose of punitive damages is to punish, not to permanently cripple or destroy." *Grynberg, supra*, 573 N.W.2d at 508–09 (reducing punitive damage award in a 3–2 decision in part because the award was about ten percent of the defendant's net worth). The $4,335,000 punitive damage award is approximately 5.8% of LeeBoy's net worth. The award would hurt the defendant, but not permanently cripple nor destroy the defendant. The Court finds that this factor indicates some reduction of the punitive damage award.

The final factor is consideration of all other relevant circumstances of this case. LeeBoy contends that it did not know the termination of LeeBoy violated the law and that as soon as it found out that the termination contravened the law in South Dakota, it offered to reinstate DMI on the same terms. In fact, it was after a settlement demand was made by DMI's lawyer and after the lawsuit was filed against LeeBoy that the offer to reinstate was made by LeeBoy's lawyer. (TT at 126–27.) Legal authority in the form of this Court's opinion in the *DMI v. Ingersoll Rand* case was presented with DMI's settlement demand. The response of reinstatement was really more in the nature of settlement negotiations conducted between lawyers for the respective parties. Despite that, the Court allowed the offer of reinstatement into evidence over DMI's objection as it was relevant to the mitigation issue. DMI in both testimony and argument took the position that the reinstatement offer was a hollow offer. (TT at 130–31.) The jury apparently agreed that it was a hollow offer.

■ Principles can be taken from reported decisions, but due to the unique sets of facts and legal issues presented in each case, there is no bright line or definitive ratio. In addition, there is no one case that is so factually and legally similar that it is controlling. Taking all of the facts and the law into consideration, it is the Court's conclusion that under South Dakota law this punitive damage award must be reduced. The reduction is not being made as a result of any federal or state constitutional limitations on punitive damages. Rather, the reduction is made as a matter of trial court discretion under state law. After considering all of the relevant factors, the Court concludes that the punitive damage award should be reduced to $2,660,000 which is approximately 3.5% of LeeBoy's net worth and only 4 times the compensatory damage award of $665,000. The compensatory award was generous, but it did not contain a punitive element. If DMI does not accept this punitive damage award in writing within 30 days from the date of this Memorandum Opinion and Order, a new trial on punitive damages only will be ordered. *See, e.g., Denesha v. Farmers Ins. Exchange*, 161 F.3d 491, 505 (8th Cir.1998)(remand to the district court "with instructions to submit to Denesha remittitur in the amount of $700,000, with

the option of a new trial on the issue of punitive damages only . . . .")

#### 4. Admission of Evidence Regarding LeeBoy's Termination of Other Dealers

LeeBoy relies on *State Farm, supra,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585, to argue that it was error to allow evidence that LeeBoy terminated dealers in other states at the same time it terminated DMI as part of the company's business plan under new ownership. The out-of-state conduct at issue in *State Farm* is very different from LeeBoy's out-of-state conduct at issue here. In *State Farm,* the Supreme Court said that the punitive damage award was based on "conduct that bore no relation to the [plaintiffs'] harm." *Id.* at 1516. The Supreme Court noted that

> [e]vidence pertaining to [State Farm's so-called 'Performance, Planning & Review' policy of meeting corporate fiscal goals by capping payments on claims companywide] concerned State Farm's business practice for over 20 years in numerous States. Most of these practices bore no relation to third-party automobile insurance claims, the type of claim underlying the [present] complaint.

*Id.* at 1518. The Supreme Court criticized the Utah Supreme Court for considering "State Farm's investigation into the personal life of one of its employees and, in a broader approach, the manner in which State Farm's policies corrupted its employees" *Id.* at 1523. "Because the [plaintiffs had] shown no conduct by State Farm similar to that which harmed them," the Supreme Court concluded, "the conduct that harmed them is the only conduct relevant to the reprehensibility analysis." *Id.* at 1524. The Supreme Court held that only evidence bearing a sufficient "nexus" to the harm at issue in a given case may be properly considered in determinations of punitive damages because it "may be probative when it demonstrates the deliberateness and culpability of the defendant's actions." *Id.* at 1522.

■ The Supreme Court did not rule out the introduction and consideration of out-of-state conduct for the purpose of determining reprehensibility. As discussed in the punitive damages section of this Memorandum Opinion, LeeBoy's termination of dealerships throughout the United States reflected the exact same conduct that harmed DMI, it proved that the conduct was not an isolated occurrence, and it demonstrated that it was intentional as opposed to a mere accident. All of these factors are relevant to the reprehensibility analysis. *See State Farm,* 123 S.Ct. at 1520.

#### 5. Punitive Damage Instruction and LeeBoy's Financial Information

■ LeeBoy contends that Jury Instruction No. 18 failed to advise the jury that LeeBoy's financial condition should be based on its current net worth and thus it provided inadequate guidance to the jury. LeeBoy further argues that its net worth and not its purchase price should have been the measure if its financial condition for punitive damage purposes. DMI points out that LeeBoy's Annual Report was admitted into evidence without objection. (Trial Exhibit # 38.) LeeBoy failed to proffer any evidence of its net worth and it failed to object to DMI's argument to the jury that it ought to consider the $89 million selling price as part of the financial condition of LeeBoy. The $89 million assumes the same value for the 16% minority share. Accordingly, LeeBoy waived its arguments regarding net worth evidence. *See, e.g., Grabinski, supra,* 136 F.3d at 570–71 (defendants' failure to put on evidence of their net worth constitutes waiver of defendants' argument that the

trial court erred in refusing to consider post-verdict affidavits of net worth); *Latham Seed Co. v. Nickerson American Plant,* 978 F.2d 1493 (8th Cir.1992) (defendant's argument that the jury was presented no evidence of its financial condition lacked merit because defendant failed to introduce the evidence).

 Even if LeeBoy waived its arguments regarding net worth, the South Dakota pattern jury instruction on punitive damages that the Court gave the jury in this case advises the jury that one factor it should consider in determining the amount of punitive damages is the defendant's financial condition. *See* Final Jury Instruction No. 18. Although net worth is the traditional guideline for determining financial condition, South Dakota law does not require that a defendant's financial condition, or its ability to pay punitive damages, be determined solely on the basis of its net worth. Financial statements sometimes are used to estimate the market value of a company, but a company's selling price is another indication of its value because it clearly establishes what a buyer not only thinks the company is worth, but also paid for it. Evaluation experts and preparers of financial statements opine but are not subject to the ultimate test of what they paid for the business. The Court finds that there was enough evidence in the record concerning the financial condition of LeeBoy to support the punitive damage award.

### 6. *Closing Argument on Punitive Damage Claim*

 LeeBoy argues that the punitive damage award was based on improper closing argument by counsel for DMI. LeeBoy asserts that it was improper for DMI to criticize LeeBoy's international ties with First Islamic and to cite to LeeBoy's conduct in terminating dealers throughout the United States. LeeBoy also contends that the Court should have instructed the jury not to consider LeeBoy's out-of-state conduct in awarding punitive damages. As stated earlier, to constitute reversible error, statements made in argument must be not only plainly unwarranted but also clearly injurious, and LeeBoy has the burden of showing prejudice resulting from the unwarranted statements. *City of Malden v. Union Elec. Co.,* 887 F.2d 157, 164 (8th Cir.1989). The Court already has found that all references to the First Islamic Bank were professional and not prejudicial. The Court has also addressed the relevancy of LeeBoy's conduct in terminating other dealers throughout the United States.

After reviewing the record as a whole, the Court finds that no argument made by DMI's counsel requires a new trial. This Court is convinced that the punitive damage award was not based on prejudice against Middle Eastern countries or businesses, nor was the amount of the award based on the actions taken by LeeBoy outside the State of South Dakota. The Court agrees with DMI that the "theme" of closing argument was that the jury should award damages to recompense a small business in South Dakota that was clearly wronged by LeeBoy's actions taken in disregard of the law and DMI's rights.

### CONCLUSION

The Defendants' substantial rights were not prejudiced by the admission or exclusion of evidence at trial, and the punitive damage award is in compliance with the Due Process Clause of the United States Constitution. However, state law requires the Court to remit the $4,335,000 punitive damage award to $2,660,000. If DMI does not accept the remittitur a new trial will be held on punitive damages. Accordingly,

IT IS ORDERED that Defendant's Motion for Judgment as a Matter of Law or

New Trial or Remittitur is granted to the extent that the punitive damage award is remitted to $2,660,000.