# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2904

_____

Chester Earl Stogsdill; Brenda Hines,     *
                                     *

      Plaintiffs - Appellees,         *

                                       *    Appeal from the United States
v.                                     *    District Court for the
                                       *    Western District of Arkansas.
Healthmark Partners, L.L.C.,       *

                                         *
      Defendant - Appellant.         *

_____

Submitted:    February 9, 2004
Filed:    July 23, 2004

_____

Before LOKEN, Chief Judge, BOWMAN and WOLLMAN, Circuit Judges.

_____

LOKEN, Chief Judge.

In April 1999, nurses at Arkansas Nursing and Rehabilitation Center (ANRC) in Texarkana, Arkansas failed to alert Artie Mae Stogsdill's treating physician to a significant change in her bowel condition that led to fatal septic shock. The administrators of Stogsdill's estate brought this malpractice action against Healthmark Partners, the owner of ANRC. A jury awarded the administrators $500,000 in compensatory and $5,000,000 in punitive damages. Healthmark appeals the district court's denial of post-verdict relief from the punitive damages award, which is more than eight times Healthmark's net worth. Healthmark challenges the award under both Arkansas law and the Due Process Clause of the U.S. Constitution.

We conditionally affirm subject to the administrators' acceptance of a reduced award of $2,000,000 in punitive damages.

## I.

Healthmark first argues that it is entitled to judgment as a matter of law on the administrators' claim for punitive damages. The Supreme Court of Arkansas has held that an award of punitive damages requires proof

> that the defendant acted wantonly in causing the injury or with such a conscious indifference to the consequences that malice may be inferred. In other words . . . it must appear that the negligent party knew, or had reason to believe, that his act of negligence was about to inflict injury, and that he continued in his course with a conscious indifference to the consequences, from which malice may be inferred.

D'Arbonne Constr. Co. v. Foster, 123 S.W.3d 894, 898 (Ark. 2003) (citations omitted), quoted in Union Pac. R.R. v. Barber, No. 03-57, 2004 WL 352525 (Ark. Feb. 26, 2004), and Morris v. Union Pac. R.R., No. 03-1622, 2004 WL 1432288, at *6 (8th Cir. June 28, 2004). Healthmark as employer "is liable for punitive damages for such acts of its agents acting within the scope of their employment as would render the agents themselves liable for such damages." In re Aircraft Accident at Little Rock, 351 F.3d 874, 876 (8th Cir. 2003). We must uphold the jury's decision to award punitive damages unless "no reasonable jury could find on the record below that [Healthmark's agents] knew, or ought to have known, in light of the surrounding circumstances, that their conduct would naturally and probably result in injury and that they continued such conduct in reckless disregard of the circumstances from which malice may be inferred." In re Aircraft Accident, 351 F.3d at 878-79.

Stogsdill began living at ANRC in September 1998. She suffered from degenerative muscle disease and diabetes that confined her to a wheelchair and from

-2-

chronic pulmonary disease that required continuing use of oxygen. As Stogsdill's condition made her prone to constipation, her admitting physician, Dr. Lowell Vereen, gave standing orders that she receive an impaction check every three days, an enema when necessary, and milk of magnesia as needed.

Stogsdill's nursing charts reflect that, after normal bowel movements during March 1999, she was constipated from April 3 to April 11, 1999. The charts reflect that an unidentified nurse performed an impaction check on April 4 with zero results, and that Stogsdill refused an impaction check on April 7 by Nurse Ruth Anderson, who did not testify at trial. Also on April 7, Nurse Juanita Vasseau charted that Stogsdill had "0 changes in condition." On April 8, Stogsdill complained of constipation. The charts include a note by Nurse Vasseau that she performed an impaction check, gave Stogsdill an enema that expelled a small amount of feces, and heard active bowel sounds. The note also states that Stogsdill's abdomen was distended, but there was evidence suggesting that this chart entry was improperly made after the fact. Notes from an unidentified nurse on April 10 state that Stogsdill was "impacted."

In the early hours of April 11, Stogsdill complained of a stomachache and said she needed to have a bowel movement. Nurse Joey Stinnett performed an impaction check and gave an enema with "small result." At 5:00 a.m. Stogsdill vomited; a note told the next shift to follow up but did not record an attempt to determine the cause of the vomiting. The next chart entry at 9:10 a.m. stated that Stogsdill's abdomen was hard with no bowel sounds. Later that morning, her husband found her lying slumped over in her wheelchair with foul smelling white foam at her mouth while two nurses aides were in the room making her bed. An ambulance took Stogsdill to the hospital, where she was found to be in septic shock with a perforated bowel.

Stogsdill underwent surgery at 2:00 a.m. on April 12. The surgeon testified that she had the appearance of being pregnant and that the amount of free stool in her

abdomen was "[p]robably the wors[t] contamination I'd seen inside a person's belly." Two more surgeries were performed to wash out Stogsdill's abdomen, but she died on April 29 from multi-organ failure resulting from sepsis caused by the perforated bowel. The surgeon opined that the bowel perforation occurred more than forty-eight hours prior to the surgery.

Several experts testified that the standard of care for a nursing home requires that a resident's treating physician be notified of a significant change in the resident's condition. It is undisputed that ANRC did not notify Stogsdill's treating physician, Dr. Vereen, of her ongoing constipation at any time between April 3 and her hospitalization on April 11. There was substantial expert testimony that, given Stogsdill's overall condition, her normal bowel movements in March, and Dr. Vereen's standing instructions, three days without a bowel movement in early April was a significant change in condition requiring notice to her physician. Stogsdill's husband testified that her stomach was noticeably swollen on April 7, yet a nurse refused Stogsdill's request to call a doctor. For the next three days, Mr. Stogsdill testified, the nurses told him they could not call the doctor "every time somebody gets a bellyache." On April 8, Stogsdill's daughter-in-law visited her and asked the nurses to call a physician; the nurses said they would but failed to do so.

We agree with the district court that a reasonable jury could find this evidence sufficient to warrant an award of punitive damages under Arkansas law. The ANRC nurses knew of their duty to notify Stogsdill's treating physician of any significant change in her medical condition. They knew from Dr. Vereen's standing instructions that Stogsdill was prone to constipation and that three days without a bowel movement was of serious concern. Their own charts reflect eight days of constipation, yet the nurses administered only sporadic, inadequate treatment and ANRC staff refused numerous requests by Stogsdill and her family to call Dr. Vereen. In these circumstances, a reasonable jury could find more than negligence or even gross negligence. The jurors could find that Healthmark's agents "knew, or ought to

have known, in light of the surrounding circumstances, that their conduct would naturally and probably result in injury and that they continued such conduct in reckless disregard of the circumstances from which malice may be inferred." In re Aircraft Accident, 351 F.3d at 878-79. We affirm the district court's denial of Healthmark's motion for judgment as a matter of law on this issue.

## II.

Healthmark next argues that the $5,000,000 punitive damages award is grossly excessive under Arkansas law and the Due Process Clause. We review whether the punitive damages award is excessive under state law de novo, viewing the evidence in the light most favorable to the plaintiffs. See Advocat, Inc. v. Sauer, 111 S.W.3d 346, 357-58 (Ark.), cert. denied, 124 S. Ct. 532 and 124 S. Ct. 535 (2003). We likewise conduct the federal due process analysis de novo. See Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 436 (2001).

To determine whether a punitive damages award must be reduced as excessive, the Supreme Court of Arkansas looks first at whether the award is excessive under Arkansas law, considering "the extent and enormity of the wrong, the intent of the party committing the wrong, all the circumstances, and the financial and social condition and standing of the erring party." Sauer, 111 S.W.3d at 358 (quotation omitted). Reduction is necessary if the damages are "so large as to shock the conscience of the court, or if it is clear that the jury was influenced by passion or prejudice." Harold McLaughlin Reliable Truck Brokers, Inc. v. Cox, 922 S.W.2d 327, 334 (Ark. 1996). The Arkansas courts apply the U.S. Supreme Court's due process analysis in BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996), in considering whether an award is conscience-shocking and in determining how much to reduce an excessive award. See Barber, 2004 WL 352525; Sauer, 111 S.W.3d at 359-63. In Gore, the Supreme Court delineated three guideposts for determining whether a punitive damages award is excessive: "the degree of reprehensibility of the

[action]; the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases." 517 U.S. at 575. We apply the same analysis in determining the legality of the award under both federal and state law. See Eden Elec., Ltd. v. Amana Co., 370 F.3d 824, 827-28 (8th Cir. 2004).

**Reprehensibility.** "[P]unitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003). The trial evidence established that ANRC nurses failed to treat Stogsdill's lengthy constipation and ignored their duty to contact her treating physician despite numerous requests that they do so. In addition, there was evidence of a practice of careless and at times fraudulent charting of residents' condition. The result was not merely economic injury. Because of ANRC staff's conscious indifference to her life-threatening change in condition, Stogsdill suffered a perforated bowel, the worst case of abdominal contamination her surgeon had ever seen, and death. Thus, the degree of reprehensibility is substantial, although the neglect of a nursing home resident was far worse in Sauer, where a $63,000,000 punitive damages award shocked the conscience of the appellate court. 111 S.W.3d at 359.

On the other hand, there was no evidence that the conduct of the ANRC nurses "was the result of intentional malice, trickery, or deceit, [rather than] mere accident." Campbell, 538 U.S. at 419. Moreover, the trial record gives two reasons to infer that the amount of the verdict was the product of passion or prejudice rather than a reasonable assessment of reprehensibility. First, substantial trial evidence concerned alleged general conditions at ANRC that were not relevant to the nurses' failure to treat Stogsdill's constipation and to notify Dr. Vereen of her changed condition. This extraneous evidence may well have caused the jury to base its punitive damages award on evidence unrelated to the treatment Stogsdill received in April 1999. "A

-6-

defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business." Campbell, 538 U.S. at 423.

Second, as we have explained, punitive damages are warranted in this case because of the gross neglect of nurses who failed to identify and act upon Stogsdill's life-threatening constipation. But in closing argument, plaintiffs' counsel made an entirely different appeal to the jury:

> Now, don't misunderstand me. *We don't blame the individuals working at this nursing home.* They're in a tough position. We applaud them for what they do with what little they have to do it with. We blame the people at the top. We blame Healthmark Partners, LLC.

(Emphasis added.) Only specific acts that evidence malice may be the basis for punitive damages. See Campbell, 538 U.S. at 418-23. Yet the jury was not urged to award substantial punitive damages based on malice inferred from the conduct of the Healthmark agents who failed to properly care for Stogsdill. Rather, the jury was urged to punish "people at the top," who had nothing to do with Stogsdill's care, in a blatant appeal to anti-business bias. The inference is strong that the amount of the award reflects bias and a focus on irrelevant considerations.

The punitive damages award of $5,000,000 is more than eight times Healthmark's net worth of $597,000. Although the administrators argue that net worth is not "truly representative of Healthmark's financial condition," the trial record provides no other basis to measure financial condition, a factor the Supreme Court of Arkansas considers highly relevant. Viewing this combination of factors, we conclude that ANRC staff's tragic neglect of Stogsdill's change in condition was sufficiently reprehensible to justify a substantial award of punitive damages but that the award of more than eight times Healthmark's net worth was conscience-shocking as a matter of Arkansas law and grossly excessive from the due process perspective.

Compare Sauer, 111 S.W.3d at 362-63; Jones v. Swanson, 341 F.3d 723, 737-38 (8th Cir. 2003).

**Ratio.** In determining the extent to which a punitive damages award exceeds the maximum consistent with due process, the Supreme Court has repeatedly expressed its unwillingness to "draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable." Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 18 (1991); see Campbell, 538 U.S. at 424-25; Gore, 517 U.S. at 582. However, the Court recently noted, "[o]ur jurisprudence and the principles it has now established demonstrate . . . that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." Campbell, 538 U.S. at 425. A greater ratio may be appropriate when compensatory damages are low, but when compensatory damages are substantial, "perhaps [punitive damages] only equal to compensatory damages" may be appropriate. Campbell, 538 U.S. at 425.

Here, the jury awarded $500,000 in compensatory damages. The ratio between punitive and compensatory damages is ten-to-one, more than, but not significantly more than, a single-digit ratio. The compensatory damages award is substantial, however, and the punitive damages award is many times Healthmark's net worth. In these circumstances, the four-to-one ratio approved by the Supreme Court of Arkansas in Sauer, 111 S.W.3d at 361, and by the U.S. Supreme Court in Haslip, 499 U.S. at 23, becomes an appropriate due process maximum. This ratio produces an award of $2,000,000, which is consistent with the awards in cases cited by the administrators as examples of large punitive damages awards for nursing home malpractice. See Rodebush v. Okla. Nursing Homes, Ltd., 867 P.2d 1241, 1243 (Okla. 1993) ($1.2 million); Montgomery Health Care Facility, Inc. v. Ballard, 565 So.2d 221, 226 (Ala. 1990) ($2 million); Beverly Enters.–Fla., Inc. v. Spilman, 661 So.2d 867, 868, 874 (Fla. App. 1995) ($2 million); Tex. Health Enters., Inc. v. Geisler, 9 S.W.3d 163, 170 (Tex. App. 1999) ($2.88 million).

**Comparison with Civil and Criminal Penalties.** The due process analysis also compares a punitive damages award with "the civil or criminal penalties that could be imposed for comparable misconduct." Gore, 517 U.S. at 583. The Arkansas adult abuse law provides that a long-term care facility may be sued by the Attorney General for abuse or neglect of an impaired adult and is "subject to pay a civil penalty" of not more than $10,000 for each violation or not more than $50,000 for death from a single violation, but not both. ARK. CODE ANN. § 5-28-106(a)(2)-(3) (Supp. 2003). The long-term care facility law provides for civil penalties not exceeding $5,000 per month for placing residents at risk of injury or death. ARK. CODE ANN. § 20-10-205 to -206. Criminal neglect of an impaired adult causing serious physical injury or substantial risk of death is a Class D felony punishable by a fine of up to $10,000, imprisonment up to six years, restitution, or a combination of imprisonment and fine. ARK. CODE ANN. §§ 5-28-103(c)(1), 5-4-104(d), 5-4-201(a)(2), 5-4-301, 5-4-401(a)(5). Comparing these potential penalties with the punitive damages award in this case is difficult because the specific number of violations is unknown. See Sauer, 111 S.W.3d at 362. However, we doubt that ANRC staff's neglect of Stogsdill in early April 1999 reflected anywhere near the 500 violations of the adult abuse law needed to warrant a civil penalty of $5,000,000.

For the foregoing reasons, we conclude that a punitive damages award in excess of $2,000,000 would be conscience-shocking as a matter of Arkansas law and so grossly excessive as to violate due process. When a jury awards excessive damages, remittitur to the maximum amount proved is an appropriate remedy. See Am. Road Equip. Co. v. Extrusions, Inc., 29 F.3d 341, 345 (8th Cir. 1994). Whether to grant a remittitur "is a procedural matter governed by federal, rather than state, law." Schaefer v. Spider Staging Corp., 275 F.3d 735, 738 (8th Cir. 2002) (quotation omitted). We have employed the remittitur remedy rather frequently, see In re Air Crash at Little Rock, 291 F.3d 503, 513 (8th Cir.), cert. denied, 537 U.S. 974 (2002), and the Supreme Court of Arkansas employed the remedy to cure an excessive punitive damages award in Sauer, 111 S.W.3d at 369. Accordingly, we conditionally

affirm the judgment of the district court, subject to the administrators' acceptance of a remittitur of the punitive damages award to $2,000,000.  Absent the administrators' acceptance of the remittitur, we reverse and remand for a new trial on liability and damages.

_____