# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

Nos. 03-2652/04-1577

———————

Diesel Machinery, Inc.,　　　　　　　*
　　　　　　　　　　　　　　　　　　*
　　　　　　　　Appellee,　　　　　　*
　　　　　　　　　　　　　　　　　　*　Appeals from the United States
　　　　v.　　　　　　　　　　　　　*　District Court for the
　　　　　　　　　　　　　　　　　　*　District of South Dakota.
B.R. Lee Industries, Inc.,　　　　　　*
　　　　　　　　　　　　　　　　　　*
　　　　　　　　Appellant.　　　　　　*

———————

Submitted: December 16, 2004
Filed: August 8, 2005

———————

Before BYE, JOHN R. GIBSON, and GRUENDER, Circuit Judges.

———————

BYE, Circuit Judge.

Diesel Machinery, Inc. (DMI), sued B.R. Lee Industries, Inc. (LeeBoy),[1] alleging LeeBoy unlawfully terminated DMI's dealer franchise. The district court[2] entered partial summary judgment in DMI's favor on liability, and a jury subsequently awarded DMI compensatory damages of $665,000, and $4.335 million in punitive

---

[1]LeeBoy is the tradename of the products manufactured by B.R. Lee Industries. Both parties refer to B.R. Lee Industries as LeeBoy, and we do so as well.

[2]The Honorable Lawrence R. Piersol, United States District Judge for the District of South Dakota.

damages, remitted to $2.66 million by the district court.  See Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 328 F. Supp. 2d 1029, 1051-56 (D. S.D. 2003).  In this appeal, LeeBoy challenges the grant of partial summary judgment and several of the district court's pre-trial, trial and post-trial rulings.  We affirm the district court in all respects.

I

DMI is a construction equipment dealer in South Dakota.  LeeBoy manufactures several models of pavers and other road-building equipment.  In November 2000, LeeBoy entered a dealership agreement with DMI giving the latter exclusive rights to sell LeeBoy products throughout South Dakota as well as seven counties in Minnesota.  Initially effective through December 31, 2001, the agreement provided it would thereafter "automatically renew for successive one (1) year terms." DMI's App. at 76.  The agreement also indicated either party could terminate the agreement with "advance written notice of termination at least sixty (60) days (or longer if required by the laws of the state where your principal office is located) prior to the end of the then current term."  Id.  The agreement further provided:

> Some states have laws that give you certain rights which may vary from, or are in addition to, those found in this Agreement.  If your principal place of business is located in one of those states, this Agreement is amended to the fullest extent necessary to provide you those rights.

Id. at 77.

This provision resulted from DMI's request to modify the initial draft of the agreement, which had provided North Carolina law would govern. DMI wanted the benefit of the South Dakota Dealer Protection Act (SDDPA), which it understood to permit termination of the agreement only if DMI justly provoked LeeBoy through misconduct.  See S.D. Codified Laws § 37-5-3 (prohibiting a manufacturer or distributor from canceling a dealer's franchise "unfairly . . . and without just

-2-

provocation"); Groseth Int'l, Inc. v. Tenneco, Inc., 410 N.W.2d 159, 168 (S.D. 1987) (holding "just provocation [under § 37-5-3] requires some sort of misconduct or shortcoming on the part of the dealer.").

After entering the agreement, DMI took its obligation to LeeBoy seriously. DMI likened its relationships with the manufacturers whose lines it carried to a marriage, putting the goodwill it had built with its customers on the line when promoting products. DMI trained its sales and service employees on LeeBoy products and procedures. Tim Jenkins, LeeBoy's Manufacturer's Representative for the territory which included South Dakota, presented sales training sessions to DMI sales people and traveled with various DMI salesmen on customer calls to promote LeeBoy products. LeeBoy's literature was disseminated to DMI's sales people, and DMI's sales people studied the LeeBoy product and procedures manual. DMI also stocked – in both its Sioux Falls and Rapid City branches – the parts LeeBoy recommended for stocking.

DMI advertised LeeBoy's products. LeeBoy provided DMI with a canvas sign or poster (approximately 3' x 5') displaying the LeeBoy logo, which DMI placed in its dealership lobby. DMI advertised LeeBoy products on its Internet website, in its DMI Product Support Report (a monthly publication indicating DMI's current inventory), and in the DMI Difference Magazine (a publication sent to about 2000 DMI customers and potential customers). DMI displayed product brochures for LeeBoy equipment in the lobbies of both its Sioux Falls and Rapid City branches. DMI's sales manager also prepared an advertising flyer specifically to promote the LeeBoy Force Feed Loader (referred to in South Dakota as a snow loader), which LeeBoy sent to all of its customers along with LeeBoy's own product brochure.

DMI purchased two pavers from LeeBoy within the first six months of the franchise period. DMI ordered the first paver in March of 2001 and purchased it in June of 2001. DMI leased this paver for three months to Bowes Construction in

Brookings, South Dakota; Bowes ultimately purchased the paver in September 2001. DMI purchased a second LeeBoy paver in May 2001 to lease to M&S Construction in Deadwood, South Dakota.[3] DMI was in the process of stocking a third LeeBoy paver when LeeBoy terminated the franchise.

On July 12, 2001, eight months into the agreement, Bryce Davis of LeeBoy called DMI's president, Dan Healy, and canceled the franchise agreement. Davis initially gave no reason for the termination; but LeeBoy had recently acquired another product line, Rosco,[4] and planned to use an existing Rosco dealer network to sell LeeBoy products.[5] On July 13, 2001, when LeeBoy confirmed DMI's termination in writing, it referred to its "acquisition of Rosco" as the sole reason for the termination, indicating "[t]he consolidation of dealers has resulted in the cancellation of your LeeBoy Dealer Agreement effective July 12, 2001."

LeeBoy never complained about DMI's performance before the termination. There were no problems regarding warranties, credit, sales performance, training, advertising, stocking requirements or quality of service. DMI had not breached the

---

[3]This second purchase did not result from DMI's sales efforts. M&S Construction located the paver at a LeeBoy dealership in Denver, Colorado. The Denver dealer informed M&S it had to buy a paver from DMI, the authorized LeeBoy dealer for South Dakota. After M&S contacted DMI, DMI discovered the LeeBoy factory could not deliver a new paver in time to meet M&S's needs, so DMI purchased the paver from the Denver dealer and leased it back to M&S. The record indicates this type of transaction – where a dealer purchases equipment from another dealer – is common in the equipment industry.

[4]Rosco manufactures asphalt distributors, brooms, spray patchers, and other road maintenance equipment.

[5]The existing Rosco dealer in South Dakota was J.D. Evans, one of DMI's competitors. Two or three days before LeeBoy terminated DMI, LeeBoy contacted J.D. Evans and asked it to be LeeBoy's exclusive dealer in South Dakota.

dealer agreement or violated any LeeBoy program, practice, policy, rule or guideline. In fact, DMI performed significantly better than LeeBoy's previous South Dakota dealer, who had no sales of LeeBoy pavers in the five years before DMI's franchise. LeeBoy admitted DMI had not breached or violated the dealership agreement prior to the termination, and that the sole reason for the termination was LeeBoy's acquisition of Rosco.

As it turned out, DMI's was just one of several dealer agreements across the country LeeBoy terminated due to its acquisition of Rosco. At trial, DMI presented evidence, and argued, that LeeBoy's dealer terminations were consistent with a corporate strategy of "growth through acquisition." LeeBoy was acquired by an investment bank, First Islamic Bank, and its co-investors, in January 2000. After the acquisition, LeeBoy became a portfolio company of Crescent Capital Investments, Inc., an Atlanta-based company owned by a First Islamic subsidiary, whose function it was to evaluate potential acquisitions for First Islamic and provide management and oversight services to portfolio companies. Crescent Capital advised First Islamic on the latter's acquisition of LeeBoy, and in turn advised LeeBoy on its acquisition of Rosco. Following Crescent's advice, LeeBoy "developed a plan for growing the company both organically and through acquisitions." LeeBoy expected its acquisition of Rosco to lead to a "lot of synergies between the two companies in both the distribution channel as well as the product channel," that is, LeeBoy could expand to new areas covered by existing Rosco dealers, and vice versa. Some areas, however, already had both Rosco and LeeBoy dealers. LeeBoy's plan required it to terminate some LeeBoy dealers in those areas that overlapped with an existing Rosco dealer.

DMI's evidence showed LeeBoy put its corporate interests first during the Rosco acquisition, and disregarded the contractual and statutory rights of some existing dealers. For example, Ed Underwood, Crescent Capital's executive director and a LeeBoy board member, knew dealers were protected by various state laws, but ignored the issue when LeeBoy's board discussed dealer terminations, indicating the

issue of how to handle territories with both LeeBoy and Rosco dealers was "not on our list. . . . The discussion of dealer termination was very limited. They were being consolidated, period." Indeed, with respect to DMI, Underwood said South Dakota was "not big on my map." Kelly Majeski, LeeBoy's vice president, knew DMI's termination might violate the law but chose not to seek legal advice before going forward with the termination. Pat Labriola, LeeBoy's president and CEO, admitted he was aware of state laws that protect dealers, but did not review those laws indicating "[t]hat's what I hire lawyers for." There was no evidence, however, Labriola bothered to consult with lawyers before terminating DMI. Bryce Davis, who made the phone calls to cancel at least ten dealers, acknowledged several got upset and threatened litigation, with some specifically referring to state laws protecting them from cancellation. Undeterred, LeeBoy plowed ahead with its consolidation plans.

A week after DMI's termination, DMI's attorney contacted LeeBoy by letter. The letter referred to the SDDPA's prohibition against canceling a dealer's franchise "without just provocation," claimed the termination would cause DMI significant damage, offered to settle the dispute for $600,000, and promised litigation if LeeBoy did not respond to the settlement offer by August 3, 2001. DMI's attorney also referred to a previous suit DMI brought against Ingersoll-Rand for wrongful termination of DMI's Ingersoll-Rand franchise, and "enclosed for review by your law department" a copy of an order entered in that case which resolved some preliminary issues in DMI's favor.

When LeeBoy did not respond by August 3, DMI filed this suit. In relevant part, DMI's complaint alleged LeeBoy's termination was unfair and without just provocation in violation of the SDDPA. The complaint prayed for damages for loss of business profits, loss of goodwill and reputation in the community, and loss of DMI's investments in training, educating, and employing personnel to sell, promote

and service LeeBoy's products. In addition, DMI alleged LeeBoy's statutory violations and other wrongful conduct justified punitive damages.

LeeBoy's initial response to DMI's lawsuit suggests it did not take the suit seriously. LeeBoy referred to some of DMI's claims as "spurious" and contended DMI was "seriously overstat[ing]" its damages and prospects of success. A short exchange of letters took place between LeeBoy and DMI discussing settlement of the pending suit. In the last letter dated September 13, 2001, LeeBoy continued to maintain DMI's claims had no "legal or factual basis," and claimed for the first time "DMI's productivity fell far short of LeeBoy's expectation." Nevertheless, because DMI had expressed concern over the termination, LeeBoy said it was "prepared to re-appoint DMI as its exclusive dealer pursuant to a mutually acceptable dealer Agreement that complies with South Dakota law" and offered to forward a copy of a proposed agreement. DMI refused the reinstatement offer and proceeded with its lawsuit.

Prior to trial, DMI moved for partial summary judgment on liability, contending LeeBoy's termination was without "just provocation" and violated the SDDPA as a matter of law. The district court agreed and granted DMI's motion. The case proceeded to a jury trial on the issue of damages. The jury awarded DMI lost profit damages of $665,000, and punitive damages of $4.335 million. LeeBoy filed a post-trial motion for judgment as a matter of law (JAML), or in the alternative, for a new trial or remittitur of the damages. The district court denied the post-trial motions in large part, but remitted the punitive damage award to $2.66 million. Diesel Mach., 328 F. Supp. 2d at 1051-56. LeeBoy filed a timely appeal.

II

## A.    The Franchise of any Dealer

LeeBoy first contends the district court erred in granting DMI partial summary judgment on liability because the agreement between LeeBoy and DMI was not the "franchise of any dealer" within the meaning of the SDDPA. See S.D. Codified Laws § 37-5-3 ("It is a Class 1 misdemeanor for any manufacturer . . . unfairly, without due regard to the equities of the dealer and without just provocation, to cancel the franchise of any dealer."). LeeBoy contends the SDDPA only protects dealers who are subject to economic coercion by a manufacturer, i.e., dealers who make a substantial financial investment as part of their agreement with a manufacturer. LeeBoy claims DMI's investment in LeeBoy was not significant enough to trigger the SDDPA, given the fact DMI is a relatively large dealer and sells many other product lines.

LeeBoy's interpretation of the SDDPA is based upon an unpublished district court decision. See Agee Agric. Equip. Sales & Superior Mgf. Co. v. Trail King Indus., No. CIV 85-4148, 1986 WL 12127, at *3 (D. S.D. Oct. 27, 1986), aff'd, 822 F.2d 1094 (8th Cir. 1987) (unpublished table disposition). In Agee, Rodney Agee and Ralph Hefter, two salesmen who operated out of their homes in California and Florida, contracted with Trail King, a South Dakota manufacturer of agricultural and commercial trailers, to establish Trail King dealerships in their geographic areas (Agee in California, Nevada, and Arizona; Hefter in Florida, Georgia, North and South Carolina). Neither Agee or Hefter maintained a significant amount of Trail King inventory.

The Agee district court determined Agee and Hefter "were really manufacturer's representatives" rather than dealers. Id. at *4. The court interpreted the SDDPA "to apply only to dealers that maintain a stock of parts or complete or

whole machines." Id. at *3. The court relied in part upon the Wisconsin Supreme Court's interpretation of Wisconsin's Fair Dealership Law in Foerster, Inc. v. Atlas Metal Parts Co., 313 N.W.2d 60 (Wis. 1981) for the proposition "the law was meant to protect only those small businessmen who make a substantial financial investment in inventory, physical facilities, or 'good will' as a part of their association with the grantor of the dealership." Agee, 1986 WL 12127, at * 3 (quoting Foerster, 313 N.W.2d at 63).

LeeBoy requests us to adopt the Agee district court's limited definition of "dealer" because we affirmed the judgment in Agee. LeeBoy's reliance upon our affirmance is misplaced. We did not issue an opinion in Agee, and therefore expressed no opinion on the district court's interpretation of the SDDPA. When we affirm the judgment in a case without issuing an opinion, our affirmance has no precedential effect and can not be read as necessarily approving of the district court's reasoning. See Ill. State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 182-83 (1979) ("A summary disposition affirms only the judgment of the court below."); Fusari v. Steinberg, 419 U.S. 379, 391 (1975) (Burger, C.J., concurring) ("When we summarily affirm, without opinion . . . we affirm the judgment but not necessarily the reasoning by which it was reached."). We therefore review this issue on a clean slate.

To determine whether the SDDPA only protects dealers who have made a substantial financial investment as part of their agreement with a manufacturer, we look first look to the language of the statute itself. Paracelsus Healthcare Corp. v. Philips Med. Sys., Nederland, B.V., 384 F.3d 492, 495 (8th Cir. 2004). If the statutory language is unambiguous, our analysis need go no further and we simply apply the plain language of the statute. Id.

The SDDPA prohibits a manufacturer or distributor from unfairly canceling "the franchise of any dealer." S.D. Codified Laws § 37-5-3. When LeeBoy and DMI

entered the dealership agreement in November 2000 the words "franchise" and "dealer" were undefined in the statute, and thus those words "are to be understood in their ordinary sense."  S.D. Codified Laws § 2-14-1.  The ordinary meaning of "franchise" is the "sole right granted by the owner of a trademark or tradename to engage in business or to sell a good or service in a certain area."  Black's Law Dictionary 683 (8th ed. 2004).  A "dealer" is one "who purchases goods or property for sale to others; a retailer."  Id. at 427.

Construing the plain language of the statute, we reject LeeBoy's claim DMI was not a dealer covered by the SDDPA.  The November 2000 agreement clearly granted DMI a "franchise" as that term is ordinarily understood, and DMI was clearly a "dealer" as that term is ordinarily understood.  The SDDPA applies to "the franchise of any dealer," and does not limit its application to dealers who maintain a significant inventory of a manufacturer's products, or to dealers who make a substantial investment as part of their agreement with a manufacturer.

Our conclusion is buttressed by a 2004 amendment to the SDDPA.  The amendment expressly defines "dealer" to mean

> any person, or the person's successor who, for commission or with intent to make a profit or gain, sells, exchanges, rents, leases with the option to purchase, or offers or attempts to negotiate a sale or exchange any merchandise as defined by this chapter, or who is engaged wholly or in part in the business of selling any such merchandise.

S.D. Codified Laws § 37-5-12.1.  During the legislative hearings, the bill's sponsor, State Representative Claire B. Konold, repeatedly emphasized the changes to the SDDPA were not intended to be substantive, but to clarify the existing statute.  See Hearing on H.B. 1188 Before the House Comm. on Commerce, 2004 Legislative Sess. (S.D. Jan. 27, 2004) ("This rewrite does not change our current law . . . [It is a] step in clarifying [existing law]."); Hearing on H.B. 1188 Before the Full House,

-10-

2004 Legislative Sess. (S.D. Jan. 29, 2004) ("This bill does not change any part of current law. . . . I assure you there is no change in current law."); Hearing on H.B. 1188 Before the Senate Comm. on Commerce, 2004 Legislative Sess. (S.D. Feb. 17, 2004) ("The bill does not, and I repeat, it does not change our law in any way – good, bad, or indifferent.").[6]

"Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction." Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 380-81 (1969). The legislative history leaves no doubt the 2004 amendment merely clarified the meaning of "dealer" under the pre-existing version of the statute. DMI clearly satisfies the definition of "dealer" under the amended version of the statute. Thus, we conclude the SDDPA applies to the November 2000 agreement between LeeBoy and DMI.[7]

## B.      Just Provocation

LeeBoy next contends the district court erred in granting summary judgment on liability because the court should have submitted the issue of "just provocation" to the jury. We disagree. Although the question whether a termination is done unfairly and without just provocation is ordinarily a question of fact, the court's function in addressing a summary judgment motion "is to determine whether a dispute about a material fact is genuine, that is, whether a reasonable jury could return a verdict for the nonmoving party based on the evidence." Quick v. Donaldson Co.,

---

[6]The audio for all three of Representative Konold's statements are available at http://legis.state.sd.us/sessions/2004/1188.htm.

[7]Having determined the SDDPA's protection is not limited to dealers who make a substantial investment as part of their agreement with a manufacturer, we have no need to address LeeBoy's claim that DMI's investment was insufficient to trigger the protection of the statute.

Inc., 90 F.3d 1372, 1377 (8th Cir. 1996). "The basic inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Id. at 1376 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)).

Under South Dakota law, just provocation "requires some sort of misconduct or shortcoming on the part of the dealer." Groseth, 410 N.W.2d at 168. LeeBoy admitted its sole reason for terminating DMI was the acquisition of Rosco. LeeBoy further admitted it had never complained about DMI's performance before the termination occurred, and DMI had not breached the dealer agreement or violated any LeeBoy program, practice, policy, rule or guideline. Thus, there was simply no evidence the termination decision resulted from any misconduct or shortcomings on DMI's part. The district court correctly determined LeeBoy failed to present a genuine factual dispute about whether the termination was justly provoked.

## C.    Reinstatement Offer

Next, LeeBoy contends DMI failed to mitigate its damages by unreasonably refusing an unconditional offer of reinstatement. LeeBoy moved for JAML on this ground, which the district court denied. We review *de novo* the district court's denial of a motion for JAML, using the same standard as the district court, that is, the evidence is viewed in the light most favorable to the prevailing party and the court can not weigh or evaluate the evidence or consider questions of credibility. Smith v. Chase Group, Inc., 354 F.3d 801, 806 (8th Cir. 2003). "A grant of JAML is proper only if the evidence viewed according to this standard would not permit 'reasonable jurors to differ as to the conclusions that could be drawn.'" Id. (quoting Dace v. ACF Indus., Inc., 722 F.2d 374, 375 (8th Cir.1983)).

The district court denied LeeBoy's motion for JAML in part because "DMI presented credible testimony that it did not know exactly what the reinstatement offer

from LeeBoy would involve." <u>Diesel Mach.</u>, 328 F. Supp. 2d at 1037. This alone was a sufficient reason to deny JAML. LeeBoy had the burden of proving it made an offer of reinstatement, and that DMI's rejection of it was objectively unreasonable. <u>Smith v. World Ins. Co.</u>, 38 F.3d 1456, 1465 (8th Cir. 1994). In order for an offer of reinstatement to completely terminate a plaintiff's right to damages, the offer must be unconditional. <u>Ford Motor Co. v. Equal Opportunity Comm'n</u>, 458 U.S. 219, 241 (1982). DMI did not know exactly what the offer involved because it was not an unconditional offer. The offer was made in the last of an exchange of letters between LeeBoy and DMI discussing settlement of DMI's pending suit, and thus DMI reasonably thought the offer was tied to settling the suit. DMI had no obligation to accept an offer which required it to compromise its claims against LeeBoy. <u>See</u> <u>id.</u> at 232 n.18 ("The claimant's obligation to minimize damages in order to retain his right to compensation does not require him to settle his claim . . . in whole or in part.").

Furthermore, LeeBoy said it was "prepared to re-appoint DMI as its exclusive dealer pursuant to a mutually acceptable dealer Agreement that complies with South Dakota law. . . . [I]f this is acceptable . . . we will forward a copy of a proposed Agreement." Thus, LeeBoy's offer was conditioned upon the parties' ability to reach a *new* dealer agreement. DMI did not know what LeeBoy would consider "mutually acceptable." If the offer was truly unconditional, LeeBoy would have offered to reinstate the *existing* contract and there would have been no need to negotiate a new "mutually acceptable" contract.

The district court also noted the evidence showed

DMI officers did not believe the offer was sincere, in part because, at the same time it made the offer, LeeBoy said, for the first time, that DMI's sales performance fell short of LeeBoy's expectations. DMI officers thought LeeBoy would terminate the relationship again shortly after

-13-

reinstatement,[8] resulting in loss of customer confidence in DMI. . . . Pat Healy also testified about problems caused by a loss of trust in the relationship between a manufacturer and a dealer.

Diesel Mach., 328 F. Supp. 2d at 1037. In addition, at the same time it offered to negotiate a new contract with DMI, LeeBoy continued to go forward with preparations to have J.D. Evans act as its South Dakota paver dealer. Even if LeeBoy's offer had been unconditional, this was sufficient evidence upon which to submit to the jury the question whether DMI acted reasonably in rejecting the reinstatement offer. LeeBoy did not object to the mitigation instructions given by the district court, and the jury determined LeeBoy failed to prove DMI unreasonably rejected the offer. Reasonable jurors could differ as to DMI's reasonableness under these circumstances. Thus, we find no error in the district court's denial of LeeBoy's motion for JAML.

### D. Evidentiary Rulings

LeeBoy brought a motion for a new trial challenging a number of the district court's evidentiary rulings, which the district court denied. We review the evidentiary rulings for an abuse of discretion, Jones v. Swanson, 341 F.3d 723, 735 (8th Cir. 2003), keeping in mind "[a]n allegedly erroneous evidentiary ruling does not warrant a new trial 'unless the evidence was so prejudicial that a new trial would likely produce a different result.'" Harrison v. Purdy Bros. Trucking Co., Inc., 312 F.3d 346, 351 (8th Cir. 2002) (quoting Bevan v. Honeywell, Inc., 118 F.3d 603, 612 (8th Cir.1997)).

---

[8]Indeed, at trial LeeBoy's damage expert based his projection of DMI's damages on the assumption LeeBoy would have terminated the dealership agreement on December 31, 2001, the first date the contract itself would have allowed termination if unencumbered by the SDDPA.

## 1. The July 20 Demand Letter/Ingersoll-Rand Litigation

First, LeeBoy contends the district court abused its discretion by excluding the letter dated July 20, 2001, which referred to DMI's suit against Ingersoll-Rand and contained an offer to settle for $600,000. LeeBoy contends the letter was relevant to show DMI's true motivation in rejecting LeeBoy's reinstatement offer, i.e., that DMI believed litigation would be more fruitful than reinstatement. We have concluded LeeBoy's reinstatement offer was conditional, however, meaning its mitigation defense necessarily fails. Because LeeBoy offered the letter in support of its failed mitigation defense, the district court's exclusion of the July 20 letter clearly does not warrant a new trial.

Even if the mitigation defense was colorable and the reinstatement offer relevant, the letter does not show DMI believed litigation against LeeBoy would be more fruitful than reinstatement. The letter did not reveal the ultimate outcome of the Ingersoll-Rand litigation, nor did it indicate DMI made more money by suing Ingersoll-Rand than selling the latter's products, or how DMI felt about suing Ingersoll-Rand – the letter merely established the district court ruled in DMI's favor on some preliminary legal matters in a previous suit.

Furthermore, under Federal Rule of Evidence 403's balancing test, the district court properly concluded the merits of the Ingersoll-Rand case would become an issue if the letter were introduced. DMI argued the letter was prejudicial because it made DMI look litigious, entitling it to show the Ingersoll-Rand suit was justified, which would have "resulted in a trial within a trial that would not have been that helpful to the jury." Diesel Mach., 328 F. Supp. 2d at 1037-38. The district court was well within its discretion when it excluded the letter.

-15-

## 2. First Islamic Bank

Prior to trial, LeeBoy filed a motion in limine asking the district court not to allow the mention of First Islamic's name. The trial took place in November 2002, and LeeBoy argued the jury might harbor bias against Islamic interests following the attacks on the World Trade Center on September 11, 2001. The district court denied the motion in limine, stating:

> So the name of First Islamic is going to come up, but plaintiff is cautioned it is only to come up in a business like, fair manner, because obviously with some people in the middle east we have had problems, but that doesn't mean that we do with all people. Matter of fact, we need their cooperation and support, and we have it in many instances, so I don't want the plaintiff to take any advantage of any ill feelings there might be, and I will be quick to sustained (sic) an objection and give a curative instruction on the spot if you do. So I want everybody to be aware of that.

Trial Tr. at 37-38.

During voir dire, the district court told the venire panel:

> [T]here will be some evidence . . . an entity that has some financial relationship with the defendant is a foreign corporation, and it is a foreign corporation in the middle east, and of course they are entitled to the same treatment as anybody else is. . . . I want to find out if anybody here, just because some corporation that isn't even a party to this lawsuit, just has some relationship to the defendant, is a foreign corporation, is that going to make a difference to you . . . because we should talk about that and both sides are entitled to know that. Would that make a difference to anybody, because if so, please raise your hand and we will talk about it.

Voir Dire Tr. at 19. No veniremember indicated they would treat a foreign corporation differently. Id.

Our review of the trial transcript – which exceeds 1,000 pages – shows DMI's attorney referred to "First Islamic" four times during opening statement, twice during examination of witnesses, and once during closing argument. First Islamic was also referred to several times when both DMI and LeeBoy read into the record portions of the deposition of Ed Underwood, Crescent Capital's executive director. The district court reviewed Underwood's deposition and ruled on objections made therein before it denied LeeBoy's pre-trial motion in limine. The district court concluded in its post-judgment order "[t]he name was used in a business-like, fair manner [and] LeeBoy has not shown that any references to First Islamic Bank appealed to any claimed bias of the jury." Diesel Mach., 328 F. Supp. 2d at 1038.

LeeBoy never objected at trial to the few references to First Islamic (and even introduced its own evidence referring to First Islamic by name), thus failing to preserve any claim of evidentiary error, except for plain error review. See Peerless Corp. v. United States, 185 F.3d 922, 925 (8th Cir. 1999) ("[W]hen a motion to exclude evidence is made in limine and is overruled, if the evidence is thereafter admitted at trial without objection, 'the error, if any, has not been preserved for appeal.'") (quoting Huff v. Heckendorn Mfg. Co., Inc., 991 F.2d 464, 466 (8th Cir. 1993) (in turn quoting Starr v. J. Hacker Co., Inc., 688 F.2d 78, 81 (8th Cir. 1982))); Doe ex rel. Doe v. B.P.S. Guard Servs., Inc., 945 F.2d 1422, 1427 n.3 (8th Cir. 1991) (reviewing evidentiary issue for plain error where party failed to object at trial after district court denied its motion in limine). We follow this rule because:

> Motions in limine are frequently made in the abstract and in anticipation of some hypothetical circumstance that may not develop at trial. . . . Thus, a party whose motion in limine has been overruled must object when the error he sought to prevent with his motion is about to occur at

trial. This will give the trial court an opportunity to reconsider the grounds of the motion in light of the actual – instead of the hypothetical – circumstances at trial.

Huff, 991 F.2d at 466 (quoting Collins v. Wayne Corp., 621 F.2d 777, 783 (5th Cir. 1980) (citations omitted)).

"Plain error is a stringently limited standard of review, especially in the civil context." Horstmyer v. Black & Decker, (U.S.), Inc., 151 F.3d 765, 771 (8th Cir. 1998) (internal quotation and citation omitted). At a minimum, "an unpreserved error in the civil context must meet . . . the Olano[9] standard to warrant correction." Wiser v. Wayne Farms, 411 F.3d 923, 927 (8th Cir. 2005). LeeBoy's alleged claim of error clearly does not satisfy Olano's stringent plain error standard. Olano requires a party to show an obvious error affected its substantial rights and seriously affected the fairness, integrity, or public reputation of judicial proceedings. Id. at 926-27. There is simply no evidence the jurors harbored a bias against First Islamic Bank, or that DMI's attorney tried to appeal to any claimed bias against foreign interests.

LeeBoy also claims DMI's attorney appealed to the jurors' claimed bias against First Islamic during closing argument by asking the jurors a rhetorical question: "[H]ow do you get a message from here all the way over to the powers that be?" LeeBoy failed to object to this statement during argument, and thus our review is limited to plain error review. Crump v. Versa Products, Inc., 400 F.3d 1104, 1109 (8th Cir. 2005). We see no plain error. LeeBoy only speculates this statement referred to First Islamic rather than LeeBoy itself – an out-of-state corporation – and we reiterate there is no evidence the jurors harbored a bias against First Islamic Bank.

---

[9]United States v. Olano, 507 U.S. 725 (1993).

### 3. Present Value Discount Rate

Next, LeeBoy contends the district court abused its discretion when it struck from the record certain testimony offered by one of LeeBoy's expert witnesses, Bruce Burton, on damages. When discussing the concept of reducing damages to their present value, Burton used a present value discount rate of 17.5%. He arrived at 17.5% by using a two-step analysis. As the district court explained, "[f]irst he determined the interest rate or return that DMI could reasonably be expected to receive on an investment of the lump-sum payment. Next he increased that interest [discount] rate by an amount he determined by considering the risks and uncertainties associated with DMI's cash flow." Diesel Mach., 328 F. Supp. 2d at 1040. In other words, Burton added the second step of discount to reflect the increased risk of re-investing a lump sum award back into an ongoing business rather than into more traditional investments.

The district court initially allowed Burton's testimony, but subsequently struck the second step analysis, concluding it conflicted with South Dakota law on present value reduction. The district court noted South Dakota's pattern jury instruction on reducing damages to present value requires the reduction to reflect "the interest rate or return which such Plaintiff could reasonably be expected to receive on an investment of the lump-sum," id., but does not require a business to invest a lump sum obtained in a lawsuit back into the business, id. at 141. In addition, the district court excluded the testimony on the grounds it would be confusing to the jury.

LeeBoy contends Burton's opinion and discount rate calculations were proper under South Dakota law, and the district court's exclusion of the evidence was doubly damaging to it – by striking the testimony on the discount rate and issuing a corrective instruction right in the middle of Burton's testimony, LeeBoy claims the

district court essentially nullified Burton's testimony as a whole. DMI counters the district court correctly held Burton's methodology conflicted with South Dakota law.

The reduction of damages to present value is not governed by statute in South Dakota, but by the common law. The leading South Dakota case on the issue is Howard v. Sanborn, 483 N.W.2d 796, 800-02 (S.D. 1992) which adopted a "virtually risk-free investment" rate modeled after Minnesota, Iowa, and federal law. Howard adopted a model instruction using a risk-free investment rate that would have "tables or some other helpful means [for the jury] to reduce present value." Id. at 802. LeeBoy contends, however, Howard provides two alternate methods of discounting to present value – one using the model instruction, and the other "providing an expert to reduce the damages for the jury." Id. Thus, LeeBoy contends it could properly offer Burton's opinion on present value for the jury's consideration, including his discount to reflect reinvestment in a business. LeeBoy also argues Howard dealt with future damages for an individual, and thus does not rule out using the methodology Burton used in the case of future damages for a business.

The district court did not abuse its discretion in striking the testimony. There is a difference between discounting to present value damages awarded in a lawsuit, and discounting to present value the value of a business based on a future stream of lost profits. Although Burton's methodology is recognized as a sound way to calculate the latter, that was not the issue here. Burton attempted to use the method for a different purpose, that is, to explain to the jury how to discount to present value damages it may award in its verdict. We agree South Dakota law does not require DMI to reinvest its award back into its business. It was within the district court's discretion to use the model instruction approach approved in Howard, rather than allow an expert to reduce the damages for the jury. Because the district court chose to give the model instruction, we agree the second step of Burton's analysis conflicted with the instruction and would have been confusing to the jury

### 4. Lost Profits Testimony

Next, LeeBoy claims the district court abused its discretion in allowing one of DMI's owners, Dan Healy, to present testimony on lost profits. We disagree. A business owner's testimony is sufficient to support an award of lost profits. See Pullman v. Land O'Lakes, Inc., 262 F.3d 759, 765 (8th Cir. 2000) (applying South Dakota law); see also Olsen v. Aldren, 170 N.W.2d 891, 895 (S.D. 1969).

LeeBoy further attacks a number of specific items Healy testified to, such as his estimate on DMI's growth rate, a ten-year projection of lost profits (based on DMI's history of having at least ten-year relationships with other manufacturers), a 25% "Other Equipment" estimate (that is, how much money over and above the sale of pavers DMI would realize from the sale of other LeeBoy equipment), and an estimate of the amount DMI would realize from the sale of parts and service. We reject LeeBoy's attacks. Healy's experience in the business provided the foundation for all the specifics to which he testified. LeeBoy's objections to this testimony go to its weight, which LeeBoy could vigorously attack during cross-examination, rather than its admissibility. The district did not abuse its discretion by allowing the testimony.

### E. Punitive Damages

LeeBoy contends the district court erred in submitting the issue of punitive damages to the jury. We review the district court's decision to submit the issue of punitive damages to the jury for an abuse of discretion. Hofer v. Mack Trucks, Inc., 981 F.2d 377, 383 (8th Cir. 1992).[10]

---

[10]The South Dakota courts review the decision for clear error. See Harter v. Plains Ins. Co., Inc., 579 N.W.2d 625, 634 (S.D. 1998).

Under South Dakota law, a trial court may submit punitive damages to the jury when clear and convincing evidence shows a "reasonable basis" to believe there has been willful, wanton, or malicious conduct. Isaac v. State Farm Mut. Auto. Ins. Co., 522 N.W.2d 752, 761 (S.D. 1994). The reasonable basis standard establishes "a preliminary, lower-order quantum of proof than must be established at trial." Id. Although malice is required, it may be shown by either actual or presumed malice. Id. DMI's claim for punitive damages was predicated on a claim of presumed malice, which "can be shown by demonstrating a disregard for the rights of others." Biegler v. Am. Family Mut. Ins. Co., 621 N.W.2d 592, 605 (S.D. 2001). An act "conceived in the spirit of mischief or of criminal indifference to civil obligations" supports punitive damages. Dahl v. Sittner, 474 N.W.2d 897, 900 (S.D. 1991) (quoting Hannahs v. Noah, 158 N.W.2d 678, 682 (S.D. 1968)).

DMI contends the evidence was sufficient to submit punitive damages to the jury because it showed LeeBoy demonstrated a careless disregard for DMI's rights under the SDDPA, an act which imposes both criminal and civil obligations. We agree. The evidence showed LeeBoy was aware of the SDDPA's application before terminating DMI's franchise, and chose to ignore its requirements. DMI had specifically negotiated for the inclusion of language referring to South Dakota's laws in the dealership agreement, and LeeBoy modified its standard contract to satisfy DMI's request. John Knuths, LeeBoy's representative at trial and president of Rosco, was intimately familiar with the requirements of the SDDPA, having testified about proposed amendments to the SDDPA before the South Dakota legislature. Knuths specifically provided Kelly Majeski, LeeBoy's vice president, with a copy of the SDDPA before LeeBoy terminated DMI. Majeski merely glanced at the SDDPA before putting it in a file, and admitted he did not seek any legal advice on the lawfulness of terminating DMI's contract. Pat Labriola, LeeBoy's president and CEO, admitted he was aware state laws provided protection to dealers like DMI, but seemed unconcerned about the dealership agreement's incorporation of the SDDPA, and took no steps to determine whether DMI's termination violated the law. Ed Underwood,

-22-

a member of LeeBoy's board of directors, admitted South Dakota was not "big on [his] map," creating the inference LeeBoy did not care whether it violated DMI's contractual or statutory rights.  Given these facts, the district court did not abuse its discretion in submitting the issue of punitive damages to the jury.

LeeBoy also contends the remitted punitive damage award of $2.66 million violates its federal constitutional rights under the Due Process Clause, raising two arguments.  First, Leeboy argues the district court allowed evidence of its out-of-state conduct (i.e., the termination of other dealers) without instructing the jury to avoid using that evidence to determine the amount of punitive damages.  See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 422-23 (2003) (indicating out-of-state conduct is relevant to show the deliberateness of a defendant's misconduct when that conduct has a nexus to the specific harm suffered by the plaintiff, but the jury must be instructed to limit its award of punitive damages to the harm actually suffered by the individual plaintiff).  LeeBoy did not object to the district court's punitive damage instruction on this ground during trial, however, and thus our review is limited to plain error review.

Although the punitive damage instruction should have limited the jury's consideration of LeeBoy's out-of-state conduct, LeeBoy has not shown that its substantial rights were affected by the error, or that the error impugned the fairness, integrity, or public reputation of the judicial proceedings.  The termination of other dealers was mentioned just once in closing argument, but not in the context of the amount of punitive damages; DMI's counsel merely responded to LeeBoy's claim that DMI unreasonably rejected its reinstatement offer by noting no other terminated dealers were reinstated by LeeBoy.  DMI's counsel never asked the jury to consider LeeBoy's out-of-state conduct when determining the amount of punitive damages.  When addressing punitive damages, DMI's counsel referred only to the damage LeeBoy caused DMI, and suggested the jury put South Dakota on LeeBoy's "map."  DMI's counsel suggested the jury award punitive damages equal to 5% of LeeBoy's

overall net worth of $89 million. It appears the jury followed that suggestion, awarding $4.335 million in punitive damages, and thus it is reasonable to assume the jury also followed counsel's lead in focusing solely on the harm LeeBoy caused DMI when assessing punitive damages. As the district court noted, it was clear DMI's theme was that "the jury should award damages to recompense a small business in South Dakota that was clearly wronged by LeeBoy's actions taken in disregard of the law and DMI's rights." Diesel Mach., 328 F. Supp. 2d at 1056. Under these circumstances, we find no plain error.

Finally, LeeBoy contends its conduct was not sufficiently reprehensible to warrant $2.6 million in punitive damages and the four-to-one ratio between the punitive and compensatory awards exceeds constitutional limits. The Supreme Court has set forth three "guideposts" to consider in determining whether a particular punitive damage award is excessive in a constitutional sense. Those guideposts are: the reprehensibility of the misconduct; the disparity between the plaintiff's actual or potential harm and the punitive damage award; and the difference between the amount of punitive damages and the civil (or criminal) penalties authorized or imposed in comparable cases. Campbell, 538 U.S. at 418 (citing BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575 (1996)). "The dominant consideration for assessing the constitutionality of a punitive damages award is the reprehensibility of the defendant's conduct." Williams v. ConAgra Poultry Co., 378 F.3d 790, 796 (8th Cir. 2004) (citing Gore, 517 U.S. at 575).

With respect to the first guidepost, reprehensibility, the courts are to consider five factors: (1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) whether the target of the conduct had financial vulnerability; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. Campbell, 538 U.S. at 419.

-24-

Here, the first three reprehensibility factors weigh on LeeBoy's side. DMI's harm was economic, not physical; the tortious conduct did not jeopardize personal health or safety; and DMI was not financially vulnerable. The punitive damage award is not doomed, however, simply because some factors weigh in the defendant's favor. See, e.g., Eden Elec., Ltd. v. Amana Co., 370 F.3d 824, 829 (8th Cir. 2004) (affirming a punitive damage award approximately 4.5 times greater than the compensatory damage award where only some of the reprehensibility factors weighed on the plaintiff's side), cert. denied , 125 S. Ct. 1322 (2005) . The last two reprehensibility factors weigh on DMI's side. As the district court noted "LeeBoy demonstrated a pattern of misconduct and the harm was intentional and not a mere accident or negligence." Diesel Mach., 328 F. Supp. 2d at 1049. Reviewing *de novo*, we agree.

LeeBoy terminated at least eighteen dealers nationwide as a result of the Rosco acquisition. LeeBoy knew its conduct violated the dealers' contractual rights, and went forward with the terminations despite its knowledge of, and decision to ignore, state dealer protection laws. By forging ahead with its consolidation plans under these circumstances, LeeBoy showed a callous disregard for the dealers' legal rights. As one LeeBoy representative testified, consideration of the dealers who would be terminated was "not on our list. . . . The discussion of dealer termination was very limited. They were being consolidated, period." Our overall review of the record satisfies us LeeBoy's conduct was sufficiently reprehensible to justify the punitive damage award.

The second "guidepost" requires us to compare the ratio between the punitive and compensatory damages. Relying upon the Supreme Court's decision in Campbell, LeeBoy contends a four-to-one ratio is unconstitutional, and that the punitive damage award should be further remitted to a one-to-one ratio. See Campbell, 538 U.S. at 425 ("When compensatory damages are substantial, then a lesser ratio [less than single digits], perhaps only equal to compensatory damages, can

reach the outermost limits of the due process guarantee."). We disagree a four-to-one ratio is *per se* unconstitutional.

Subsequent to Campbell, we have noted "the Supreme Court has repeatedly expressed its unwillingness to 'draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable.'" Stogsdill v. Healthmark Partners, L.L.C., 377 F.3d 827, 833 (8th Cir. 2004) (quoting Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 18 (1991)). Stogsdill approved a $2 million punitive damage award in a case involving $500,000 in compensatory damages, stating "the four-to-one ratio approved . . . by the U.S. Supreme Court in Haslip [is an] appropriate due process maximum."[11] Id.; see also Eden, 370 F.3d at 829 ("[W]e conclude that the ratio of slightly more than 4.5:1 does not offend due process[.]").

The final "guidepost" requires us to compare the punitive damage award with the civil or criminal penalties that could be imposed. The criminal penalty for unfairly canceling a dealer's franchise is a misdemeanor punishable by up to one year in jail and a $1,000 fine. See S.D. Codified Laws §§ 37-5-3 & 22-6-2(1). The civil penalty can be substantial, however, because the dealer is entitled to "all damages caused to such dealer by such violation." Id. at § 37-5-4.

Having considered all three guideposts, we conclude the $2.6 million punitive damage award comports with due process. The jury's original award of $4.335 million represented approximately 5% of LeeBoy's net worth which, as DMI's counsel argued, was just enough to "get their attention." Cf. Stogsdill, 377 F.3d at 833 (approving punitive damage award almost four times the defendant's net worth). We believe the remitted award, which we acknowledge is still substantial, is appropriate to "further[] the state's twin goals of punishment and deterrence" without running

---

[11]In Haslip, the Supreme Court approved a punitive damage award of $800,000, which was about four times the amount of the compensatory award. 499 U.S. at 23.

afoul of constitutional limits.  <u>Eden</u>, 370 F.3d at 829 (citing <u>Campbell</u>, 538 U.S. at 416).

III

For the reasons stated, we affirm the judgment of the district court in all respects.

_____